[No. B135863. Second Dist., Div. One. Mar. 29, 2000.]

CALIFORNIA MEDICAL ASSOCIATION, Inc., et al., Plaintiffs and Respondents, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al., Defendants and Appellants.

**COUNSEL**

Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Jerome B. Falk, Jr., Ethan P. Schulman; James E. Holst; John F. Lundberg; Jeffrey A. Blair;

Christopher M. Patti; and Michael R. Goldstein for Defendants and Appellants.

Catherine I. Hanson and Astrid G. Meghrigian for Plaintiff and Respondent California Medical Association.

Stephan, Oringher, Richman & Theodora, Arthur R. Chenen, and Robert M. Dato for Plaintiffs and Respondents Santa Monica Anesthesiology Medical Group, Inc., Thomas D. Bohlman, Evan M. Krantz and Ronald J. Wahlig.

## OPINION

**VOGEL (Miriam A.), J.**—The University of California at Los Angeles Medical Center purchased the Santa Monica Hospital Medical Center. When physician participation in the anesthesia service at the Santa Monica facility was later restricted to UCLA's faculty members, a group of anesthesiologists who had previously practiced at the Santa Monica facility sued UCLA for damages and injunctive relief. The trial court viewed the doctors' unlawful practice and unfair competition claims as meritorious and issued a preliminary injunction to prevent UCLA from using its faculty members to run the Santa Monica anesthesia service. We reverse.

### FACTS

*The UCLA School of Medicine.* The UCLA School of Medicine (one of five publicly funded medical schools within the University of California system) operates teaching hospitals in which it offers patient care, conducts clinical research, and provides clinical training to physicians.[1] Every patient admitted to a UCLA healthcare facility is a potential teaching case and, as such, is required to sign a form acknowledging "that residents, interns, medical students, students of ancillary health care professions . . . and post-graduate fellows may participate" in the patient's care. Since the decision to use a particular case for teaching purposes depends on the patient's diagnosis and the educational needs of individual students, the decision to include an intern or resident or other student in a particular patient's care can be made at any time. To ensure the students' exposure to a full range of medical problems and procedures, UCLA must have a large and diverse patient population.

---

[1]The Regents administer the University of California, including the University of California at Los Angeles, which operates the UCLA School of Medicine, the UCLA Center for Health Sciences (both located at UCLA's Westwood campus), and a primary care network of about 40 medical offices and clinics located throughout Southern California. (Cal. Const., art. IX, § 9.)

*The Acquisition of UCLA-Santa Monica.* In July 1995, UCLA purchased the Santa Monica Hospital Medical Center (UCLA-Santa Monica) in order to increase the University's population of teaching patients. UCLA's plan was to use UCLA-Santa Monica for "lower acuity" patients from the Santa Monica and West Los Angeles areas, and to limit the use of UCLA's existing Westwood facility to "higher acuity" patients.[2] In addition, the University planned to use UCLA-Santa Monica to serve the influx of primary care patients and trainees from UCLA's "Primary Care Network," a research and patient care program developed in response to a legislative mandate to increase the number of primary care physicians trained by the medical school. (Ed. Code, §§ 92720-92726.)

*The Integration of UCLA-Santa Monica into the UCLA Medical School.* It was understood from the outset that the integration of UCLA-Santa Monica into the overall UCLA Medical School program would be gradual, and full integration has yet to be completed. At this time, UCLA-Santa Monica provides comprehensive healthcare services, including emergency services for the community in which it is located and residency programs in family practice, maternal and child health, surgery, cardiology, neuro-epilepsy and oncology. At its Westwood campus, the University is now engaged in a major reconstruction project which will result in a sizeable reduction in the number of available beds in Westwood and a shift of additional patients to UCLA-Santa Monica. Ultimately, 40 percent of the Medical School's beds will be at UCLA-Santa Monica.

*The Santa Monica Anesthesia Medical Group.* Up to and including the time at which UCLA purchased the Santa Monica Hospital Medical Center, the Santa Monica Anesthesia Medical Group, Inc. (SMAMG) and its members provided anesthesia services, as independent members of the medical staff, at the facility now known as UCLA-Santa Monica.[3] In 1998, UCLA decided that the only feasible way to operate the UCLA-Santa Monica anesthesia service in conformance with the University's educational goals was as a "closed" service staffed by members of the UCLA anesthesia faculty.[4]

---

[2]"Acuity" refers to levels of complexity and specialization. By way of example, a pediatric tonsillectomy patient is a low acuity case. A heart transplant patient is a high acuity case.

[3]Neither SMAMG nor its members have a contractual relationship with UCLA-Santa Monica. In their words, they have provided anesthesia services to the hospital's patients "as independent members" of the medical staff. Neither SMAMG nor its members were owners of the Santa Monica Medical Center.

[4]"Open" services are those in which any qualified physician in the specialty theoretically may obtain practice privileges at a facility. "Closed" services, sometimes implemented by an exclusive contract between a hospital and a group of physicians, are limited to specified practitioners. Anesthesia is one of several hospital departments that may be legally operated

UCLA offered full-time faculty positions (Assistant Clinical Professor of Medicine) to all but one of the SMAMG anesthesiologists but they all declined.

Instead, Drs. Thomas D. Bohlman, Evan M. Krantz and Ronald J. Wahlig (individually and as SMAMG), joined by the California Medical Association, Inc., sued the Regents.[5] The complaint seeks damages, injunctive relief, specific performance and declaratory relief on a variety of unfair competition and tort theories. According to SMAMG, "[t]he gravamen of [its] complaint is that UCLA . . . has gone far beyond its praiseworthy teaching and research activities . . . and has commenced an aggressive business plan designed to enable the unlicensed practice of medicine by UCLA, to force community based physicians into unlawful fee-splitting and referral schemes which jeopardizes the quality of patient care, disrupts the continuity of patient care in the community, and forces private physicians out of practice, under the guise of teaching and research activities."[6]

At about the same time it filed suit, SMAMG sought a preliminary injunction to prevent UCLA "from operating the Anesthesia Service at [UCLA-Santa Monica] with employed physicians . . . ." SMAMG claimed the offers of teaching positions were a sham and insisted that UCLA was unlawfully engaged in the unlicensed practice of medicine insofar as it

---

on a closed basis. (Welf. & Inst. Code, § 14087.28.) To continue to operate the anesthesia service at UCLA-Santa Monica as an open service would have meant that UCLA had to operate two separate services, to distinguish teaching cases from non-teaching cases, to allocate cases between the open anesthesia service at UCLA-Santa Monica and the closed anesthesia service at UCLA-Westwood, and to coordinate operating room schedules on that basis.

[5]The California Medical Association, Inc., is a nonprofit professional association of physicians. The Association and the individual plaintiffs are included in our references to SMAMG. The defendants are the Regents (doing business as UCLA Healthcare), and UCLA-Santa Monica. We refer interchangeably to the Regents, UCLA, and the University.

[6]We note, again, that neither SMAMG nor its members had contractual relationships with UCLA-Santa Monica. They were not owners of the Santa Monica Hospital Medical Center. Their complaint is based on claims of unfair competition and unfair practices in violation of sections 17200 and 17500 of the Business and Professions Code, false advertising, "interference with the right to practice a profession," conspiracy to restrain trade, inducing breach of contract (based on allegations that, by its offers of faculty positions, UCLA was inducing the doctors to breach their "employment agreements" and "shareholder agreements" with SMAMG), interference with prospective business advantage, breach of fiduciary duty, and "specific performance of a contract" (based on allegations that SMAMG and its members are third party beneficiaries of the contract for the sale of the Santa Monica Hospital Medical Center to UCLA).

accepted compensation for services rendered to non-indigent and non-teaching patients. The Regents opposed the motion for a preliminary injunction.[7] After a hearing, the trial court granted SMAMG's motion for a preliminary injunction and restrained the University from (1) operating the anesthesia service at UCLA-Santa Monica with physicians employed by UCLA, (2) using physicians employed by UCLA to provide anesthesia services "to the general public for compensation" at UCLA-Santa Monica, and (3) interfering with the operation of the anesthesia service at UCLA-Santa Monica "as an open staff service," but permitting UCLA to provide anesthesia services "in any case in which an anesthesia resident or fellow is directly providing the anesthesia to a bona fide teaching patient [defined by the injunction as an indigent patient or a patient who the Chief of Anesthesia at UCLA-Santa Monica and the Chair of the UCLA Department of Anesthesia agree has a legitimate teaching value] under the direct one to one supervision of a member of the UCLA Department of Anesthesia."

The Regents filed a notice of appeal and a petition for a writ of supersedeas. After briefing, we issued a writ of supersedeas (to stay the preliminary injunction) and expedited the appeal.

DISCUSSION[8]

I.

■■■ In support of its motion for a preliminary injunction, SMAMG contended (and the trial court agreed) that the statutory ban against the corporate practice of medicine makes it illegal for UCLA to treat patients for compensation. The Regents contend the statutory ban does not apply to the University of California's medical schools and hospitals. We agree with the Regents.

---

[7]The Regents also demurred to all causes of action. The trial court sustained the demurrers to the false advertising and specific performance causes of action (without leave to amend) and to the "interference with the right to practice a profession" claim (with leave to amend). The other demurrers were overruled.

[8]UCLA says we should review the preliminary injunction de novo (because it stands or falls with our construction of the relevant statutes, not on disputed facts). (*Garamendi v. Executive Life Ins. Co.* (1993) 17 Cal.App.4th 504, 512 [21 Cal.Rptr.2d 578].) SMAMG says the relevant standard of review is abuse of discretion, and that we cannot reverse unless the trial court has exceeded the bounds of reason or contravened the uncontradicted evidence. (*IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 69 [196 Cal.Rptr. 715, 672 P.2d 121].) SMAMG's failure to point to any disputed *material* fact—it is the *characterization* of the relevant evidence, not the evidence itself, that is disputed—resolves this issue in UCLA's favor.

## A.

Business and Professions Code section 2400 provides that "[c]orporations and other artificial legal entities shall have no professional rights, privileges, or powers. However, the Division of Licensing may in its discretion, after such investigation and review of such documentary evidence as it may require, and under regulations adopted by it, grant approval of the employment of licensees on a salary basis by licensed charitable institutions, foundations, or clinics, if no charge for professional services rendered patients is made by any such institution, foundation, or clinic."[9]

## B.

The University of California is excluded from the operation of a general statutory provision if the University's inclusion would result in an infringement upon the powers granted to it as an instrumentality of the state. (*City of Los Angeles v. City of San Fernando* (1975) 14 Cal.3d 199, 276-277 [123 Cal.Rptr. 1, 537 P.2d 1250]; cf. *Regents of University of California v. Superior Court* (1976) 17 Cal.3d 533, 536-537 [131 Cal.Rptr. 228, 551 P.2d 844].)[10] To state the obvious, the application of section 2400 to UCLA would infringe upon the operation of its medical center as a teaching and research facility—its core governmental function, its *raison d'être*. (Ed. Code, § 66010.4, subd. (c) ["The University of California may provide undergraduate and graduate instruction . . . in the professions [and] shall have exclusive jurisdiction in public higher education over . . . graduate instruction in the professions of medicine, dentistry, and veterinary medicine. . . . The University of California shall be the primary state-supported academic agency for research"]; *Community Memorial Hospital v. County of*

[9]Subsequent undesignated section references are to the Business and Professions Code. Subdivision (a) of section 2401 provides that, notwithstanding section 2400, clinics operated primarily for the purpose of medical education by a public or private nonprofit university medical school "may charge for professional services rendered to teaching patients by licensees who hold academic appointments on the faculty of the university, if the charges are approved by the physician and surgeon in whose name the charges are made." Subdivision (b) of section 2401 creates yet another exemption for small, freestanding, nonprofit research institutes as defined by Health and Safety Code section 1206, subdivision (p), and has nothing to do with UCLA's medical facilities. For this reason, a statement of legislative intent addressed to such institutes (to the effect that the Legislature did not intend to have them become actively engaged in patient care activities on a routine basis) is irrelevant.

[10]Article IX, section 9, of the California Constitution provides: "(a) The University of California shall constitute a public trust, to be administered by the existing corporation known as 'The Regents of the University of California,' with full powers of organization and government, subject only to such legislative control as may be necessary to insure the security of its funds and compliance with the terms of the endowments of the university and such competitive bidding procedures as may be made applicable to the university by statute . . . ."

*Ventura* (1996) 50 Cal.App.4th 199, 206 [56 Cal.Rptr.2d 732] ["laws prohibiting the corporate practice of law or medicine do not apply to counties"]; *Estate of Miller* (1936) 5 Cal.2d 588, 597 [55 P.2d 491].)[11]

## C.

UCLA's evidence shows that every patient is *potentially* a teaching case, notwithstanding that some patients may not be seen by an intern, resident or other trainee. It is for this reason that, at every patient's first admission to the hospital or first appointment with a primary care physician, the patient must consent to student participation in his treatment. The decision whether the patient will, in fact, become a teaching case depends on the patient's diagnosis, the educational needs of the students, the medical school's staffing concerns, and other factors. UCLA's evidence also shows that, to provide a full range of medical problems and procedures for the training of its interns, residents and other students, it must admit a large and diverse patient population. To make the point, UCLA explains that, to qualify for board certification, residents must have the opportunity for direct observation and participation in the clinical treatment of certain rare or complex conditions that occur only a handful of times in a population of 10,000 patients. The more limits there are on the University's patient population, the less likely it is that the University's teaching goals can be met.

The provision of "quality patient care" is integral to UCLA's patients, to its students, and to its research into new techniques and treatments. Quality patient care is also an essential source of financial support for the entire UCLA hospital system, which now receives only 4 percent of its operating budget from state funds, with the remaining 96 percent generated by clinical income. SMAMG nevertheless contends that UCLA's exemption from section 2400 will be destroyed if, at trial, the evidence shows that not all of the patients at UCLA-Santa Monica are actually teaching patients and that UCLA is, in fact, competing with SMAMG for the same paying patient population. SMAMG is wrong. The fact that UCLA's physicians may be in competition with private physicians does not mean that UCLA is acting

[11]In 1979, the Board of Medical Quality Assurance (the agency then charged with the enforcement of section 2400 et seq.) advised the Legislature that, in the Board's view, the University of California could employ physicians because the University is "exempt from the corporate practice restrictions as [a] unit of government." This view is entitled to great weight (*People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 309 [58 Cal.Rptr.2d 855, 926 P.2d 1042]), and the Legislature's subsequent addition of sections 2400 and 2401 without overturning the exemption are strong evidence of its agreement with the Board's interpretation (*Smith v. Fair Employment & Housing Com.* (1996) 12 Cal.4th 1143, 1158 [51 Cal.Rptr.2d 700, 913 P.2d 909]). (Stats. 1980, ch. 1313, § 2, p. 4494.)

inconsistently with its statutory mandate. (*Community Memorial Hospital v. County of Ventura, supra,* 50 Cal.App.4th at pp. 206-207; *Beard v. City & County of San Francisco* (1947) 79 Cal.App.2d 753, 755-756 [180 P.2d 744].) There is no evidence at all to suggest that UCLA is making a profit or to suggest any basis for questioning its nonprofit status. Its ability to generate income to cover some of its expenses does no more than reduce the burden on the state's taxpayers. It follows that there simply is no evidence to suggest that SMAMG could prevail on its section 2400 claim.[12]

■ We are satisfied that our conclusion is consistent with the purpose of section 2400, which was adopted to protect the professional independence of physicians and to avoid the divided loyalty inherent in the relationship of a physician employee to a lay employer. (*Conrad v. Medical Bd. of California* (1996) 48 Cal.App.4th 1038, 1042-1043 [55 Cal.Rptr.2d 901]; *People v. Pacific Health Corp.* (1938) 12 Cal.2d 156, 160 [82 P.2d 429, 119 A.L.R. 1284] [the principal evils attendant upon the corporate practice of medicine spring from the conflict between the professional standards and obligations of the doctors and the profit motive of the corporate employer].) ■ Concerns about for-profit corporations have nothing to do with non-profit teaching hospitals.[13]

## II.

In support of its motion for a preliminary injunction, SMAMG also claimed that UCLA has violated section 17200 by its "demand" that SMAMG's anesthesiologists enter employment contracts with the University

---

[12]SMAMG views UCLA-Santa Monica as a stand-alone facility, without regard to the teaching activities or patient care or research at UCLA-Westwood. The trial court appears to have adopted that view. We reject it as unsupported by the law or the facts of this case. Indeed, the undisputed evidence shows that UCLA acquired the Santa Monica facility to further the medical school's teaching and research functions, and that the University's activities at the two facilities are or soon will be fully integrated. In this regard, we note that, at oral argument, SMAMG's counsel insisted that, at around the time of the purchase, UCLA had represented to the Santa Monica Hospital Medical Center that UCLA would *not* be using the Santa Monica facility for teaching purposes. The record shows otherwise. Although UCLA emphasized its existing and continuing "commitment to positive hospital [and] medical staff relationships," it has since the outset made it clear that UCLA-Santa Monica was acquired as part of UCLA's concomitant "commitment to expanding primary care training both at UCLA and [at] affiliated sites like Santa Monica . . . ."

[13]The California Medical Association has filed a separate respondent's brief in which it says it is "involved in this case to protect a law crucial to the health and welfare of the people of California—the corporate practice of medicine bar." The association's purported concerns about UCLA's alleged interference with "existing relationships" between physicians and their patients appear more imagined than real, and certainly are not supported by the record in this case.

in order to maintain their staff privileges at UCLA-Santa Monica. UCLA contends it is not subject to suit under section 17200. We agree with UCLA.

Section 17200 (part of the Unfair Practices Act) defines "unfair competition" to include "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." (See also § 17000 et seq.) Although "persons" who engage in unfair competition may be sued for damages and injunctive relief (§§ 17203-17205), the University of California is a "public entity" (Gov. Code, § 811.2) and, therefore, not a "person" within the meaning of the Unfair Practices Act. (§ 17201; *Janis v. California State Lottery Com.* (1998) 68 Cal.App.4th 824, 831 [80 Cal.Rptr.2d 549]; *Trinkle v. California State Lottery* (1999) 71 Cal.App.4th 1198, 1202-1204 [84 Cal.Rptr.2d 496]; *Community Memorial Hospital v. County of Ventura, supra,* 50 Cal.App.4th at p. 209; see also *Santa Monica Rent Control Bd. v. Bluvshtein* (1991) 230 Cal.App.3d 308, 318 [281 Cal.Rptr. 298].) It follows that, as a matter of law, SMAMG cannot prevail on its claims of unfair competition or unfair practices.[14]

## III.

SMAMG does not suggest that any of its remaining causes of action could support the issuance of a preliminary injunction.[15] Since UCLA's decision to close the anesthesia service at UCLA-Santa Monica appears to have been a necessary and reasonable step in the administration of the University's teaching responsibilities, the anesthesiologists' abstract right to continue to practice at the hospital must give way to the greater needs of the community at large. (*Major v. Memorial Hospitals Assn.* (1999) 71 Cal.App.4th 1380, 1407 [84 Cal.Rptr.2d 510]; *Mateo-Woodburn v. Fresno Community Hospital & Medical Center* (1990) 221 Cal.App.3d 1169, 1182-1185 [270 Cal.Rptr. 894]; *Redding v. St. Francis Medical Center* (1989) 208 Cal.App.3d 98, 103-108 [255 Cal.Rptr. 806]; *Centeno v. Roseville Community Hospital*

[14]This conclusion is unaffected by UCLA's involvement in commercial activity. (*Trinkle v. California State Lottery, supra,* 71 Cal.App.4th at pp. 1203-1204; *Community Memorial Hospital v. County of Ventura, supra,* 50 Cal.App.4th at p. 209.)

[15]SMAMG does contend the trial court properly enjoined UCLA's "scheme to close [UCLA-Santa Monica's] anesthesiology department" because the department was closed "solely to effectuate the unlawful corporate practice of medicine." But since this contention is premised on our acceptance of SMAMG's claim that UCLA's conduct violates section 2400, our rejection of that contention in part I, *ante,* necessarily resolves this point against SMAMG. SMAMG also contends, in the abstract, that UCLA's "demand for referral fees" (the reference is to the employment arrangements offered by UCLA to SMAMG's anesthesiologists) justified issuance of the preliminary injunction. Assuming some impropriety, SMAMG does not explain its legal theory or the nature of the injury suffered as a result of these rejected offers. We see none.

(1979) 107 Cal.App.3d 62, 70-74 [167 Cal.Rptr. 183]; *Lewin v. St. Joseph Hospital of Orange* (1978) 82 Cal.App.3d 368, 382-385 [146 Cal.Rptr. 892]; *Blank v. Palo Alto-Stanford Hospital Center* (1965) 234 Cal.App.2d 377, 385-386 [44 Cal.Rptr. 572].)

In sum, we find it unlikely that SMAMG will prevail on the merits of any of its claims at trial and therefore do not consider the other issues discussed by the parties. (*Garamendi v. Executive Life Ins. Co., supra,* 17 Cal.App.4th at p. 512; *Shoemaker v. County of Los Angeles* (1995) 37 Cal.App.4th 618, 624-625 [43 Cal.Rptr.2d 774] [in granting a preliminary injunction, the trial court must (1) evaluate the likelihood that the plaintiff will prevail on the merits at trial; if it is likely that the plaintiff will prevail, the court must then (2) balance the interim harm that the plaintiff is likely to suffer without pendente lite relief against the harm the defendant is likely to suffer by the issuance of a preliminary injunction].)[16]

### DISPOSITION

The preliminary injunction and the order granting it are reversed. The Regents and UCLA-Santa Monica are awarded their costs of appeal.

Spencer, P. J., and Masterson, J., concurred.

Respondents' petition for review by the Supreme Court was denied June 21, 2000.

---

[16]We presume that our prior issuance of a writ of supersedeas is sufficient to express our views about the relative hardships.