[No. A103481. First Dist., Div. Two. Jan. 11, 2005.]

PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC., et al.,
Plaintiffs and Appellants, v.
CALIFORNIA MILK PRODUCERS ADVISORY BOARD, Defendant and
Respondent.

872

COUNSEL

Matthew Penzer for Plaintiff and Appellant People for the Ethical Treatment of Animals.

Morgenstein & Jubelirer and Bruce A. Wagman for Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Tom Greene, Chief Assistant Attorney General, Mary E. Hackenbracht, Assistant Attorney General, and Tiffany Yee, Deputy Attorney General, for Respondents.

OPINION

**RUVOLO, J.—**

## I.

### INTRODUCTION

Appellants People For The Ethical Treatment of Animals, Inc. and John Robbins (referred to collectively as PETA) appeal from a judgment of dismissal entered after the trial court sustained demurrers without leave to amend filed by respondent California Milk Producers Advisory Board (CMAB) to PETA's amended complaint. PETA sued CMAB, inter alia, claiming its "Happy Cows" advertising campaign[1] violated California's Unfair Business Practices Act (UCL),[2] Business and Professions Code[3] sections 17200 et seq., because the advertisements were false and deceptive. The trial court sustained the demurrers after concluding CMAB was not a

---

[1] The slogan for the disputed advertising campaign is "Great cheese comes from happy cows. Happy cows come from California."

[2] Our Supreme Court has noted that this law has been referred to variously as the "Unfair Business Practices Act," "Unfair Competition Act," "Unfair Practices Act," and the "unfair competition law." (*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 558, fn. 2 [71 Cal.Rptr.2d 731, 950 P.2d 1086].) We defer to our high court's preferred "locution," and refer to it as the "unfair competition law," or UCL, unless we quote from other authorities. (*Ibid.*)

[3] All further undesignated statutory references are to the Business and Professions Code.

"person" as defined by the UCL and, thus, the state board was not subject to suit under that remedial statutory scheme.

█ We agree with the trial court that public entities, including CMAB, are not "persons" who are subject to suit under the UCL and, therefore, we affirm.

## II.

### FACTUAL AND PROCEDURAL BACKGROUND

█ PETA's operative complaint was filed on December 27, 2002, and included three separate causes of action arising out of the same alleged facts. The sole remedy sought by the complaint was injunctive relief. The complaint names only the CMAB as a defendant and alleges it to be "a[n] agricultural advisory board, created by a marketing order issued by the California Department of Food and Agriculture." Marketing order advisory boards are administrative instrumentalities of the California Secretary of Food and Agriculture (the Secretary) and have no independent ability to implement policy or other actions without the approval of the Secretary. (Food & Agr. Code, §§ 58846, 58889, 58923.) █ Among the CMAB's functions is the power and duty, subject to the Secretary's approval, to recommend promotional programs. (Cal. Dept. of Food and Agr., Marketing Branch, Marketing Order for Research, Education, and Promotion of Market Milk and Dairy Products in Cal., eff. Dec. 1, 1969, incorporating amendments through Feb. 1, 1998, art. II, § H., p. 6 (Milk Marketing Order); see also Food & Agr. Code, § 58889.) In this regard, it was noted in *Gallo Cattle Co. v. California Milk Advisory Bd.* (9th Cir. 1999) 185 F.3d 969, 971, that "[s]ince its formation, CMAB has conducted an integrated program for the promotion of milk and dairy products which includes advertising, merchandising, public relations, education and research. CMAB spends the majority of its annual budget promoting dairy products made from raw milk (such as fluid milk, cream, butter, cottage cheese, yogurt, cheese and ice cream). In doing so, CMAB attempts to increase the demand for milk produced by the California dairy farmers."

The complaint alleges that for approximately the last two years, the CMAB has been engaged in an advertising program known as the "Happy Cows" campaign, which PETA contends is explicitly and implicitly untrue, deceptive, and misleading. It will suffice for this appeal to refer to the complaint's "Introductory Statement" for a description of the nature of the alleged misrepresentations contained in CMAB's advertisements: "This is a complaint seeking a permanent injunction against the defendants to prevent ongoing deceptive advertising practices in the false representations

of the California dairy industry made in its 'Happy Cows' advertisements. The theme of these advertisements is to portray spacious, grassy pastures on beautiful, rolling hills with a few cows grazing and wandering about and 'enjoying' the ease, luxury, and contentment of life as a dairy cow in California. The tag line for each of the ads is 'Great Cheese comes from Happy Cows. Happy Cows come from California.' In reality, however, the vast majority of California's dairy cows live anything but easy, comfortable lives. They routinely spend their lives in 'dry' lots of grassless dirt (which become[] and remain[] mud throughout some months of the year), in sharp contrast to the 'fictional,' idyllic setting of the ads. They are repeatedly impregnated and then milked throughout their pregnancies. Their calves are taken away shortly after birth, many of whom are then condemned to veal crates. They commonly suffer from painful maladies from their intensive rearing. And when their worn bodies can no longer meet the inordinately high production demands of the industry, they are slaughtered. While plaintiffs do not ask the Court to rule on whether California cows are truly 'happy,' the nature of this complaint is that the conditions under which most California dairy cows are kept are so materially different (in a way that matters to, and misleads, consumers) than those depicted in the ads as to render them unlawfully deceptive and, therefore, subject to injunctive relief under California law."

The complaint's first cause of action alleges CMAB's Happy Cows campaign violates California's prohibition against false and deceptive business advertising (§ 17500 et seq.), while the third cause of action alleges the advertisements violate a specific form of prohibited false advertisements, those associated with "environmental misrepresentations." (§ 17580 et seq.) The second cause of action was brought under the general provisions of the UCL. (§ 17200 et seq.) As noted, PETA sought injunctive relief only.

Demurrers were filed by CMAB in response to the complaint raising two principal legal objections to each of the three causes of action.[4] First, CMAB contended that it was not a "person" as defined by the false advertising and UCL statutes, and thus it could not be sued for alleged violations of those statutory prohibitions. Second, it demurred on the additional ground that the CMAB lacked the legal capacity to sue and be sued, and thus, there was a "misjoinder of parties."

The trial court sustained the demurrers on the first ground asserted; that is, based on the conclusion that CMAB was not within the statutory definition of entities which could be sued under the UCL consumer remedy regimes. In so

---

[4] A third objection claiming that the third cause of action for "environmental representations" (§ 17580 et seq.) facially did not apply to the "Happy Cows" advertising campaign, was sustained by the court, and that finding is not challenged in this appeal.

ruling, the trial court relied principally, although not exclusively, on *California Medical Assn. v. Regents of University of California* (2000) 79 Cal.App.4th 542 [94 Cal.Rptr.2d 194] (*California Medical*).[5]

■ The standard by which we review the trial court's decision to sustain the demurrer without leave to amend is well settled. "The reviewing court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded. [Citations.] The court does not, however, assume the truth of contentions, deductions or conclusions of law. [Citation.] The judgment must be affirmed 'if any one of the several grounds of demurrer is well taken. [Citations.]' [Citation.] However, it is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory. [Citation.] And it is an abuse of discretion to sustain a demurrer without leave to amend if the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment. [Citation.]" (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966–967 [9 Cal.Rptr.2d 92, 831 P.2d 317]; see *Palm Springs Tennis Club v. Rangel* (1999) 73 Cal.App.4th 1, 4–5 [86 Cal.Rptr.2d 73].)

## III.

### DISCUSSION

The omnibus provision of the UCL provides: "As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code)." (§ 17200; see generally *Stop Youth Addiction, Inc. v. Lucky Stores, Inc., supra*, 17 Cal.4th at p. 560.)

■ The false advertising proscription of the UCL appears in section 17500 and prohibits "any *person*, firm, corporation or association, or any employee thereof" from falsely advertising goods or services. (Italics added.) Moreover, section 17580.5 prohibits any "*person*" from making any "untruthful, deceptive, or misleading environmental marketing claim." (Italics added.) The UCL authorizes courts to enjoin "*[a]ny person* who engages, has engaged, or proposes to engage in unfair competition . . . ." (§ 17203, italics added.) The UCL includes within its provisions it own unique definition of

---

[5] The court noted at the hearing on the demurrers that the misjoinder issue was not fatal to PETA's action inasmuch as leave to amend would have allowed PETA to cure the defect by naming the proper executive agency and state official who clearly had the capacity to be sued. Because we affirm on the ground relied on by the trial court, we need not, and do not, address the misjoinder issue.

"person": "As used in this chapter, the term person shall mean and include natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons." (§ 17201.)

As appellant recognizes: "On this appeal, this Court is not required to consider the merits of plaintiffs' claims—only whether the CMAB is a statutory 'person' and the lawsuit should move forward to be decided on its merits." "The interpretation and applicability of a statute is a question of law requiring an independent determination by the reviewing court. [Citation.]" (*East Peninsula Ed. Council, Inc. v. Palos Verdes Peninsula Unified School Dist.* (1989) 210 Cal.App.3d 155, 165 [258 Cal.Rptr. 147].)

Like the trial court, we, too, find the case of *California Medical, supra,* 79 Cal.App.4th 542 applicable and dispositive to the issue raised on appeal. In *California Medical,* a group of anesthesiologists excluded from practice at the University of California's Santa Monica Hospital Medical Center brought an action for damages and injunctive relief. (*California Medical, supra,* 79 Cal.App.4th at p. 544.) Significantly, the plaintiffs in *California Medical* sought relief under the UCL. (§ 17200 et seq.)

The appellate court reversed the lower court's injunction after concluding that the University of California was a public entity and not a "person" defined under section 17201. The court reasoned, "Although 'persons' who engage in unfair competition may be sued for damages and injunctive relief (§§ 17203–17205), the University of California is a 'public entity' (Gov. Code, § 811.2) and, therefore, not a 'person' within the meaning of the Unfair Practices Act. [Citations.] It follows that, as a matter of law, [plaintiffs] cannot prevail on its claims of unfair competition or unfair practices." (*California Medical, supra,* 79 Cal.App.4th at p. 551, fn. omitted.) The *California Medical* court also noted that its conclusion was unaffected by the fact that the challenged activity engaged in by the public entity was a commercial enterprise. (*Id.* at p. 551, fn. 14.)

Similarly, in *Janis v. California State Lottery Com.* (1998) 68 Cal.App.4th 824 [80 Cal.Rptr.2d 549], the court held that governmental entities, such as the California State Lottery Commission, are not included in the statutes' definitions of "persons." Consequently, the court held that plaintiff's claims for unfair business practices and misleading advertising under sections 17200 and 17500 failed as a matter of law. (*Id.* at p. 831.) In *Trinkle v. California State Lottery* (1999) 71 Cal.App.4th 1198, 1203 [84 Cal.Rptr.2d 496], the court adopted the same analysis.

In all of these cases, the courts noted that the definition of the term "person" in the operative statutes did not include public entities, and concluded that the UCL did not otherwise evidence any intent to impose

governmental liability. We agree. "Statutory interpretation begins with the text and will end there if a plain reading renders a plain meaning: a meaning without ambiguity, uncertainty, contradiction, or absurdity." (*Oden v. Board of Administration* (1994) 23 Cal.App.4th 194, 201 [28 Cal.Rptr.2d 388].) ▉ Section 17201 does not include any references to governmental agencies or political entities. Thus, only through an unreasonable, strained construction can the CMAB, an administrative adjunct to a governmental body, be deemed encompassed by the statutory definition of "person" as included within "natural persons, corporations, firms, partnerships, joint stock companies, associations" or "other organizations of persons." (§ 17201.)

As respondent notes, had the Legislature wanted to include governmental entities in its definition of "person" for purposes of the UCL, it would have done so. We agree. The Unfair Practices Act (commencing with § 17000), which was enacted in 1941,[6] contains its own definition of "person" to include "any person, firm, association, organization, partnership, business trust, company, corporation or *municipal or other public corporation.*" (§ 17021, italics added.) In contrast, the UCL (commencing with § 17200), which was enacted later, in 1977,[7] omitted "municipal or other public corporation" from its definition of "person." (§ 17201.) Therefore, had the Legislature wished to include governmental entities, such as the CMAB, in its definition of "person[s]" subject to UCL liability it would have done so by using language similar to that in section 17021.

Consequently, under both case law and principles of statutory interpretation, we conclude that the CMAB cannot be considered a person under the UCL. Yet, PETA maintains that a public entity is properly excludable from the statutory definition of "person" only if the civil action seeks to interfere with "a valid exercise of the state's sovereign powers." Since participation in deceptive consumer advertising cannot be construed as falling within the ambit of the proper use of governmental authority, PETA claims CMAB is a "person" as contemplated by the UCL. In making this argument PETA refers us to several cases, including *Community Memorial Hospital v. County of Ventura* (1996) 50 Cal.App.4th 199 [56 Cal.Rptr.2d 732] (*CMH*).

In *CMH*, Ventura County was sued by a private local hospital (CMH) under several theories of liability, including the UCL.[8] The hospital's complaint alleged that the county was competing unfairly with private hospitals

---

[6] Added by Stats. 1941, ch. 526, § 1, p. 1839.

[7] Added by Stats. 1977, ch. 299, § 1, p. 1202.

[8] We note that all other cases cited by PETA to support its argument that the state is a "person" for purposes of the UCL arise under statutes *other than the UCL.* (See *Flournoy v. State of California* (1962) 57 Cal.2d 497 [20 Cal.Rptr. 627, 370 P.2d 331] [state a "person" for purposes of wrongful death statute]; *Hoyt v. Board of Civil Service Commrs.* (1942) 21 Cal.2d 399 [132 P.2d 804] [state is a "person" within the meaning of declaratory relief statute]; and

by using several improper means to "deflect" indigent patients away from the county hospital and into private facilities. These methods included a refusal to accept patient transfers from private hospitals in violation of state and federal law. (*CMH, supra,* 50 Cal.App.4th at p. 203.) One of the issues addressed on appeal, and the one material to our case, was whether the county was a "person" as defined in the UCL.

The court initially observed that this question of statutory interpretation is governed by the general rule of construction that the words of a statute be given their ordinary meaning and "commonsense construction." (*CMH, supra,* 50 Cal.App.4th at p. 209, citing *Pirkig v. Dennis* (1989) 215 Cal.App.3d 1560, 1565 [264 Cal.Rptr. 494].) The court went on to explain that a county is, "strictly speaking," a subdivision of the state and not a "person," and the failure of the Legislature to include counties in the statutory definition of those who could be sued under the UCL was a "strong indication" that they were not intended to fall under the act's provisions. (*Ibid.*) Nevertheless, rather than simply concluding that CMH was therefore not a "person" under the UCL, the court unexpectedly, and abruptly, shifted its focus from the wording of the statute, and proceeded to discuss several cases employing a different method of statutory interpretation:

" '[I]n the absence of express words to the contrary, neither the state nor its subdivisions are included within the general words of a statute. [Citations.] But this rule excludes governmental agencies from the operation of general statutory provisions only if their inclusion would result in an infringement upon sovereign governmental powers. "Where . . . no impairment of sovereign powers would result, the reason underlying this rule of construction ceases to exist and the Legislature may properly be held to have intended that the statute apply to governmental bodies even though it used general statutory language only." [Citations.]' (*City of Los Angeles v. City of San Fernando* (1975) 14 Cal.3d 199, 276–277 [123 Cal.Rptr. 1, 537 P.2d 1250]; *Regents of University of California v. Superior Court* (1976) 17 Cal.3d 533, 536 [131 Cal.Rptr. 228, 551 P.2d 844]." (*CMH, supra,* 50 Cal.App.4th at p. 210.)

Neither of the two cases cited by the *CMH* court for this principle arose under the UCL. *Regents of University of California v. Superior Court* (1976) 17 Cal.3d 533 [131 Cal.Rptr. 228, 551 P.2d 844], which was decided the year before the UCL was enacted (Stats. 1977, ch. 299, § 1, p. 1202), concerned the question of whether the Regents of the University of California (the

---

*LeVine v. Weis* (2001) 90 Cal.App.4th 201 [108 Cal.Rptr.2d 562] [state agency a "person" for purpose of False Claim Act (Gov. Code, § 12650)]. The single case cited which arose under the Unfair Practices Act, the predecessor of the UCL, involved the question of whether the state was a "person" which had standing to *bring* suit, not whether it was a "person" which could be sued. (*People v. Centr-O-Mart* (1950) 34 Cal.2d 702 [214 P.2d 378].)

University) was subject to state law barring usury. That decision turned on a determination that the University was not " 'clothed with the sovereignty of the state and is not the sovereign.' [Citation.]" (*Regents of University of California v. Superior Court, supra,* 17 Cal.3d at p. 536.)

*City of Los Angeles v. City of San Fernando, supra,* 14 Cal.3d 199, concerned whether Los Angeles was a "person" within the meaning of a statute prohibiting any "person" from gaining prescriptive title against a public entity. As the *CMH* court noted, that decision did not infringe on the exercise of sovereign powers but " 'only the elimination of prescription as a means of transferring property from one arm of the government to another.' ([*City of Los Angeles v. City of San Fernando, supra,* 14 Cal.3d] at p. 277, fn. omitted.)" (*CMH, supra,* 50 Cal.App.4th at p. 211.)[9]

Once the *CMH* court altered its analytical course, it applied an "infringement of sovereign power" analysis to conclude that CMH's UCL challenge to the operation of a public hospital infringed the sovereign powers of the county which operated it. This infringement stemmed from the court's determination that one responsibility of government is the protection of public health, and the operation of a public hospital was a proper means by which sovereign power is exercised in the interest of public health. Therefore, "inclusion of the County in the Unfair Practices Act or the unfair competition statute as it relates to the operation of its hospital would result in an infringement on its sovereign powers." (*CMH, supra,* 50 Cal.App.4th at p. 210.)

First, as noted, we agree with the initial assessment of the *CMH* court that the issue of whether a public entity can be sued under the UCL as a "person" is readily answered by reference to the plain language of section 17201, a section specifically enacted to answer any question of whose conduct the Legislature intended to be subject to the reach of UCL. There is no persuasive way to argue that Ventura County is a "person," any more than the CMAB can be considered to be a "person" in the context of this case. That conclusion is sufficient to end the inquiry here, and should have been sufficient in *CMH* as well.

However, going further and applying the "infringement of sovereign power" analysis, as did the *CMH* court, we likewise conclude that allowing the CMAB to be sued under the UCL would infringe that body's, and therefore the state's, sovereign power. The creation of the CMAB is directly

---

[9] The *CMH* court could have also distinguished its case from *City of Los Angeles v. City of San Fernando, supra,* 14 Cal.3d 199, on the additional basis that the court there had to determine in the first instance what the Legislature meant by using the phrase "person, firm, or corporation." (See *id.* at p. 274.) Under the UCL, the statute specifically defines "person".

traceable to the California Marketing Act of 1937 (1937 Act), a breathtakingly extensive program of governmental assistance to this state's agriculture, designed specifically to advance the interests of all of this state's citizens. (Food & Agr. Code, § 58601 et seq.) The public interests to be furthered by this expansive use of sovereign power is clearly articulated in Food and Agricultural Code section 58653: "The marketing of commodities within this state is hereby declared to be affected with a public interest. The provisions of this chapter are enacted in the exercise of the police powers of this state for the purpose of protecting the health, peace, safety, and general welfare of the people of this state."

In meeting the objectives of the 1937 Act, numerous administrative instrumentalities of the state have bloomed under the direction of the Department of Food and Agriculture. For example, the record includes a telephone directory for the state Food and Agriculture Department, which lists approximately 25 advisory boards, commissions, councils, and programs, including CMAB, ranging alphabetically from the Alfalfa Seed Production Research Board to the California Processing Tomato Advisory Board. (State of Cal. Telephone Directory, Agency Display Information, <http://www.cold.ca.gov/agency_display.asp> [as of Jan. 11, 2005.]) According to the record, these entities are in addition to nearly 30 agricultural and seafood councils and commissions established under the Food and Agriculture Code.

Significantly, the Legislature has explained that one of the ways these administrative entities advance the interests of the state is by enhancing "the image of California agricultural and seafood products to increase the overall demand for these commodities. In this fashion, the Legislature intends that the commissions and councils operate primarily for the purpose of creating a more receptive environment for the commodity and for the individual efforts of those persons in the industry, and thereby compliment individual, targeted, and specific activities." (Food & Agr. Code, § 63901, subd. (e).)[10]

---

[10] The 1937 Act also provides an administrative remedy for claims that either a marketing order, or another provision of the 1937 Act, has been violated. In this regard, any "interested party" may file a complaint directly with the state's Director of Food and Agriculture (the Director), who may either refer the matter to the Attorney General or local district attorney's office for legal proceedings, or the Director may hold an administrative hearing to consider it. (Food & Agr. Code, § 59240.) If a hearing is held, at which testimony and evidence relating to the alleged violation is to be taken, the Director shall make appropriate findings at its conclusion. (*Id.* at § 59244.) If the Director finds that a violation of the 1937 Act or a marketing order has occurred, the matter may be referred to the Attorney General for further legal proceedings, or the Director may issue a cease and desist order to the offending parties. (*Id.* at § 59245.) At oral argument PETA's counsel conceded that no administrative complaint has been filed with the Director challenging the "Happy Cows" ad campaign.

Thus, the Legislature has directly linked the work of CMAB in promoting California's agricultural economy through promotional campaigns to important public interests of the state. That having been done, we have no hesitancy in concluding there would indeed be an "infringement of sovereign power" for the CMAB to be subject to suit under the UCL for the content of one of its promotional campaigns. Accordingly, even under the *CMH* court's analysis, CMAB is not a "person" who can be sued as a defendant under the UCL.[11]

## IV.

### Disposition

The judgment of the trial court is affirmed. Costs on appeal are awarded to CMAB.

Kline, P. J., and Haerle, J., concurred.

Appellants' petition for review by the Supreme Court was denied April 20, 2005. George, C. J., did not participate therein.

---

[11] To be clear, while we address the rationale ultimately relied on by the *CMH* court to reach its conclusion that Ventura Hospital was not a "person" for purposes of the UCL, we disagree that it is the proper test. Using an "infringement of sovereign power" analysis, as did the *CMH* court, to interpret the scope of a statutory definition is untethered to any canons of statutory construction of which we are aware. Moreover, it is difficult to imagine a scenario whereby in one context, a governmental body could be considered a "person" as defined by section 17201, while in another context, it is not. Furthermore, the issue is easily resolved by examining the "plain meaning" of the statute, a path from which the *CMH* court inexplicably departed in its opinion.