[No. A118410. First Dist., Div. Four. June 17, 2008.]

CALIFORNIA PHYSICIANS' SERVICE, Plaintiff, Cross-defendant and Appellant, v.
AOKI DIABETES RESEARCH INSTITUTE, Defendant, Cross-complainant and Respondent.

1508

**COUNSEL**

Manatt, Phelps & Phillips, Gregory N. Pimstone and Joanna S. McCallum for Plaintiff, Cross-defendant and Appellant.

deVries Law Firm, Douglas K. deVries; and Robert Kennedy Scott for Defendant, Cross-complainant and Respondent.

**OPINION**

**SEPULVEDA, J.**—A health care provider, Aoki Diabetes Research Institute (ADRI), sued a health care service plan for breach of contract, seeking reimbursement for medical services provided to the plan's members. The health plan, California Physicians' Service, doing business as Blue Shield (Blue Shield), asserts that its contract with the provider is unenforceable because ADRI is illegally organized as a nonprofit corporation instead of a professional medical corporation or partnership. Blue Shield also claims that medical providers like ADRI cannot dispute a health plan's coverage determinations. The trial court rejected Blue Shield's claims in a bench trial. The court also collaterally estopped Blue Shield from asserting that ADRI's services are experimental, and thus not covered, because a prior administrative proceeding held to the contrary. The court entered judgment for ADRI and Blue Shield appealed. We affirm the judgment.

## I. BACKGROUND

In the United States, health care services are provided predominantly by managed care organizations (MCO's). (*Rush Prudential HMO, Inc. v. Moran* (2002) 536 U.S. 355, 369 [153 L.Ed.2d 375, 122 S.Ct. 2151]; Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 1995) ¶ 6:900 (Insurance Litigation).) MCO's, called health care service plans in California, are defined as "[a]ny person who undertakes to arrange for the provision of health care services to subscribers or enrollees, or to pay for or to reimburse any part of the cost for those services, in return for a prepaid or periodic

charge paid by or on behalf of the subscribers or enrollees." (Health & Saf. Code, § 1345, subd. (f)(1); Insurance Litigation, *supra*, ¶ 6:901.) "The defining feature of an MCO is receipt of a fixed fee for each patient enrolled under the terms of a contract to provide health care if needed." (Insurance Litigation, *supra*, ¶ 6:903.)

MCO's are thought to contain costs by applying "utilization management, gatekeeper, and case management techniques." (See Health & Saf. Code, § 444.20, subd. (a) [listing functions of managed care].) They also contain risk by covering health care for a fixed fee among a group of participants: "if a participant never gets sick, the [MCO] keeps the money regardless, and if a participant becomes expensively ill, the [MCO] is responsible for the treatment agreed upon even if its costs exceed the participant's premiums." (*Pegram v. Herdrich* (2000) 530 U.S. 211, 218–219 [147 L.Ed.2d 164, 120 S.Ct. 2143].) "Because many members will utilize services at a cost of less than the fee the subscriber pays to the [MCO] and a significant number will utilize no services at all, and because the [MCO] is able to obtain medical services at lower rates due to its ability to direct volume and control costs through its ability to impose treatment limitations and lower fees on providers, *i.e.*, physicians, [a for-profit MCO] hopes that it can produce a profit after the cost of administering the program." (*Patel v. HealthPlus* (1996) 112 Md.App. 251 [684 A.2d 904, 909].)

There are several types of MCO's, including health maintenance organizations (HMO's), where patients must access care exclusively through designated physicians, and preferred provider organizations (PPO's), where patients receive the highest benefits when they go to preferred providers who have contracted with the PPO to provide services. (Insurance Litigation, *supra*, ¶¶ 6:904–6:905, 6:915.) In California, all managed care organizations are licensed and regulated by a state agency under the Knox-Keene Health Care Service Plan of 1975. (Health & Saf. Code, § 1340 et seq.; Knox-Keene Act.) The Knox-Keene Act sets strict standards for MCO's, and dictates specific health care services that must be provided. (Health & Saf. Code, § 1367.)

MCO's generally have two distinct and separate contractual relationships: one with subscribers and one with providers. (*Patel v. HealthPlus, supra*, 684 A.2d at p. 909.) Subscribers, either individually or through their employers, pay a fixed fee for health care services that are set out in a subscriber contract (sometimes called evidence of coverage and health service agreement). (*Id.* at p. 908.) The MCO separately contracts with providers, such as physicians and hospitals, to provide health care services to the MCO's subscribers. (*Ibid.*)

## II. FACTS

Appellant Blue Shield is an MCO or health care service plan. Respondent ADRI is a nonprofit corporation formed in 1986 to conduct medical research, including "clinical investigation into the nature, diagnosis, treatment, and cure for metabolic disorders such as diabetes." ADRI later expanded its corporate objective to include clinical care for individuals with metabolic disorders. The chairman of ADRI is Thomas Aoki, M.D., a licensed physician. Dr. Aoki provides services at ADRI as an independent contractor.

In October 1990, Blue Shield and ADRI executed a physician group agreement. ADRI was listed as a group "duly formed for the practice of medicine" and consisting of members holding valid physicians' certificates. Among other things, ADRI agreed to (1) abide by Blue Shield's rules and policies; (2) "render professional services within the scope of its members' licenses to Blue Shield subscribers"; and (3) accept Blue Shield's direct payment for "covered services" as full and exclusive payment for the health care provided to subscribers (aside from subscriber deductibles and copayments). On this last point, ADRI agreed that it would "not collect or attempt to collect" sums owed by Blue Shield from subscribers, nor make any surcharge against subscribers for covered services.

ADRI provides medical treatment for advanced diabetes. The treatment is "accomplished by intravenous administration of insulin in programmed pulses coinciding with administration of glucose which achieves stimulation of liver and metabolic function." The treatment is known by several names, including hepatic activation or pulsatile intravenous insulin infusion therapy (PIVIT).

From 1990 through most of 1998, Blue Shield paid ADRI for providing PIVIT treatment to Blue Shield subscribers. However, around late September 1998, Blue Shield declared that PIVIT was experimental and stopped paying for ADRI services. Blue Shield's subscriber contracts exclude from coverage services that are "Experimental or Investigational in Nature," defined as "any treatment, therapy, procedure, drug, or drug usage . . . which [is] not recognized in accordance with generally accepted professional medical standards as being safe and effective for use in the treatment of the illness, injury, or condition at issue."

Despite Blue Shield's refusal to pay ADRI for its services, ADRI continued to treat Blue Shield subscribers and submitted reimbursement claims to Blue Shield. ADRI says it continued its treatment "to prevent irreparable physical harm to the subject patients." ADRI also claims its treatment benefited Blue Shield "by preventing serious diabetic complications that would have required [Blue Shield] to pay for such things as emergency room visits, kidney dialysis, kidney transplantations, hospitalizations, surgeries, and the like."

## III.   PROCEDURAL HISTORY

ADRI notified Blue Shield that it intended to file a lawsuit for reimbursement and Blue Shield responded by filing a complaint for declaratory relief in April 2003. Among other things, Blue Shield sought a judicial declaration that ADRI had no basis to claim payment for PIVIT treatments. In June 2003, ADRI cross-complained for breach of contract. ADRI maintained that Blue Shield was collaterally estopped from asserting that PIVIT is experimental because a prior administrative decision held that PIVIT is not experimental.

A bifurcated bench trial began in November 2005, with the court first considering whether ADRI had a viable claim for breach of contract (against specified defenses) and whether the administrative decision regarding PIVIT barred Blue Shield's claim that PIVIT was experimental, and thus not covered. The court ruled in ADRI's favor in February 2006. Specifically, the court found (1) the provider agreement is enforceable. The court rejected Blue Shield's claim that the contract is illegal because ADRI was organized as a nonprofit corporation, and California generally forbids the corporate practice of medicine. The court concluded that the ban on the corporate practice of medicine was inapplicable because "the contract does not contemplate that ADRI itself would provide medical services, but rather medical services would be provided by physicians and other health providers within the scope of their license[s] as indicated by the terms of the contract"; (2) ADRI has the legal right to challenge Blue Shield's coverage determinations, contrary to the health care service plan's argument that only subscribers can contest a denial of coverage; and (3) collateral estoppel bars Blue Shield from arguing that PIVIT is experimental because an administrative decision found to the contrary. The trial court's rulings in favor of ADRI on the provider contract eliminated any need to address ADRI's alternative claim for payment under an implied-in-fact contract.

Blue Shield petitioned this court for a writ of mandate, which we denied in May 2006. The second part of the bifurcated trial concerning the amount of payment due ADRI was not held. Instead, the parties agreed on an amount of $207,300, and stipulated to entry of judgment in that amount (plus prejudgment interest and costs). The stipulation was executed on May 7, 2007, and was entered to expedite appeal. Judgment was filed on May 22, 2007. Blue Shield promptly appealed.

## IV.   DISCUSSION

Blue Shield renews its arguments from the trial court in contending (1) the provider contract with ADRI is unenforceable because ADRI is illegally organized as a nonprofit corporation instead of a professional medical corporation or partnership; (2) medical providers like ADRI cannot dispute a health

care service plan's coverage determinations; and (3) Blue Shield is not collaterally estopped from litigating whether PIVIT is experimental, and thus not covered, because the issue resolved in the prior administrative hearing is not identical to the issue here and Blue Shield was not in privity with a party to the prior proceeding. We discuss each of these contentions in turn.

## A. *The provider contract is enforceable, even if illegal*

Blue Shield argues that the trial court wrongly enforced Blue Shield's provider contract with ADRI in violation of the ban on the corporate practice of medicine. We conclude that any illegality in ADRI's form of business organization does not negate Blue Shield's contractual obligation to pay for ADRI's services.

■ "It is an established doctrine that a corporation may not engage in the practice of such professions as law, medicine or dentistry." (*People v. Pacific Health Corp.* (1938) 12 Cal.2d 156, 158 [82 P.2d 429] (*Pacific Health Corp.*).) The restriction on the corporate practice of medicine finds statutory expression in California, where the practice of medicine without a license is prohibited and corporations have "no professional rights, privileges, or power." (Bus. & Prof. Code, § 2400; see *id.*, § 2052.) The restriction is meant "to protect the professional independence of physicians and to avoid the divided loyalty inherent in the relationship of a physician employee to a lay employer." (*California Medical Assn. v. Regents of University of California* (2000) 79 Cal.App.4th 542, 550 [94 Cal.Rptr.2d 194]; see generally Fichter, *Owning a Piece of the Doc: State Law Restraints on Lay Ownership of Healthcare Enterprises* (Winter 2006) 39 J. Health L. 1.)

■ The doctrine against the corporate practice of medicine has many exceptions today. (See *Conrad v. Medical Bd. of California* (1996) 48 Cal.App.4th 1038, 1044 [55 Cal.Rptr.2d 901] ["it is evident that there are chinks in the armor of the corporate practice doctrine"].) Professional medical corporations, in which shareholders are licensed professionals, are permitted. (Bus. & Prof. Code, § 2402; Corp. Code, § 13406, subd. (a).) Certain corporate hospitals and clinics are also permitted. (Bus. & Prof. Code, §§ 2400, 2401.) A major exception has been made for corporate health care service plans, which "shall not be deemed to be engaged in the practice of a profession" and are free to employ physicians. (Health & Saf. Code, § 1395, subd. (b).)

■ ADRI says this latter exception applies here. ADRI notes that Blue Shield is a health care service plan empowered under the Knox-Keene Act to "contract with . . . any professional licensed . . . to deliver professional [medical] services." (Health & Saf. Code, § 1395, subd. (b).) But the disputed

provider contract was not between Blue Shield and individual licensed professionals—it was expressly between Blue Shield and the ADRI corporation. The difficulty here lies not with the relationship between Blue Shield and ADRI, but the internal relationship ADRI had with its physicians. The statute ADRI invokes provides only a narrow exception allowing health care service plans to employ licensed professionals; "[n]othing in its language establishes or suggests that it removes other restrictions on the relationships such professionals may have [with others.]" (*People v. Cole* (2006) 38 Cal.4th 964, 985 [44 Cal.Rptr.3d 261, 135 P.3d 669].)

It is difficult to credit ADRI's argument that the provider contract was effectively between Blue Shield and individual ADRI physicians. It is true, as the trial court found, that "the contract does not contemplate that ADRI itself would provide medical services, but rather medical services would be provided by physicians and other health providers within the scope of their license[s] as indicated by the terms of the contract." But the fact remains that the contract was expressly between Blue Shield and ADRI, a corporate entity. It was ADRI that agreed to render professional services. Of course ADRI itself would not provide medical services—it is a corporation, an artificial entity, that necessarily acts through the agency of natural persons. (*Monteleone v. Southern California Vending Corp.* (1968) 264 Cal.App.2d 798, 806 [70 Cal.Rptr. 703].) This fact does not convert the contract into one between Blue Shield and the corporate actors.

Nor are we persuaded by ADRI's claim that the ban on the corporate practice of medicine is inapplicable to nonprofit corporations. The general statutory ban makes no distinction between general corporations and nonprofit corporations: "Corporations and other artificial legal entities shall have no professional rights, privileges, or powers." (Bus. & Prof. Code, § 2400.) Moreover, the Legislature has provided a specific exemption for certain charitable organizations. (Bus. & Prof. Code, § 2400.) The statutory exemption would be superfluous if nonprofits were categorically outside the ban. The California Attorney General has rendered several opinions about the ban on the corporate practice of medicine and has "consistently expressed the view that a corporation is not exempt from the prohibition against the unlicensed practice of medicine simply because it is organized under the nonprofit corporation law." (83 Ops.Cal.Atty.Gen. 170, 173, fn. 2 (2000).)

ADRI relies upon permissive language about nonprofit medical corporations from cases predating the Knox-Keene Act when courts struggled to accommodate group health plans with the ban on the corporate practice of medicine. ADRI notes, for example, that the California Supreme Court opined that "since the principal evils attendant upon corporate practice of medicine spring from the conflict between the professional standards and

obligations of the doctors and the profit motive of the corporation employer, it may well be concluded that the objections of policy do not apply to nonprofit institutions." (*Pacific Health Corp., supra,* 12 Cal.2d at p. 160.) While the principal evils of the corporate practice of medicine may arise from the stress the profit motive places on physicians, the courts have also noted the danger of lay control—a danger that attends all types of corporations. (E.g., *California Medical Assn. v. Regents of University of California, supra,* 79 Cal.App.4th at p. 550.) In any event, the *Pacific Health Corp.* observation was dictum, as the court plainly warned. (*Pacific Health Corp.,* at pp. 159–160.) The court's sole concern in that case was with a general corporation MCO, which it disallowed. (*Id.* at p. 157.) Moreover, *Pacific Health Corp.* and cases like it suggest nothing more than a narrow exception to the ban on the corporate practice of medicine for nonprofit MCO's now regulated by the Knox-Keene Act. (E.g., *Complete Serv. Bur. v. San Diego Med. Soc.* (1954) 43 Cal.2d 201, 205–206, 210–211 [272 P.2d 497] [nonprofit MCO furnished medical services to subscribers].) ADRI is not a nonprofit MCO and has not cited any case analogous to the situation presented here.

██ While ADRI fails to persuade us that it has not violated the statutory ban on the corporate practice of medicine, Blue Shield fails to persuade us that a violation makes the provider contract unenforceable. "Generally a contract made in violation of a regulatory statute is void." (*MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 435 [30 Cal.Rptr.3d 755, 115 P.3d 41].) This rule is based on general equitable principles in seeking "to prevent the guilty party from reaping the benefit of his wrongful conduct" and "to protect the public from the future consequences of an illegal contract." (*Tri-Q, Inc. v. Sta-Hi Corp.* (1965) 63 Cal.2d 199, 218 [45 Cal.Rptr. 878, 404 P.2d 486].) But this rule "is not absolute, and many exceptions have arisen." (*MW Erectors, Inc., supra,* at p. 436.) "In compelling cases, illegal contracts will be enforced in order to 'avoid unjust enrichment to a defendant and a disproportionately harsh penalty upon the plaintiff.' [Citation.] ' "In each case, the extent of enforceability and the kind of remedy granted depend upon a variety of factors, including the policy of the transgressed law, the kind of illegality and the particular facts." ' " (*Asdourian v. Araj* (1985) 38 Cal.3d 276, 292 [211 Cal.Rptr. 703, 696 P.2d 95] (*Asdourian*).)

In *Asdourian, supra,* 38 Cal.3d 276, our Supreme Court enforced oral home improvement contracts, despite a regulatory statute requiring such contracts to be in writing. (*Id.* at pp. 289–294.) In enforcing the contracts, the court noted that the defendant property owners were not unsophisticated consumers but real estate investors, and thus "are not members of the group primarily in need of the statute's protection." (*Id.* at pp. 290, 293.) Also, the contracts at issue were not malum in se ("immoral in character, inherently inequitable or designed to further a crime or obstruct justice") but were

malum prohibitum ("only voidable depending on the factual context and the public policies involved"). (*Id.* at p. 293, italics omitted.) The court also noted that the contracts had been fully performed, and that the defendants would be unjustly enriched if "allowed to retain the value of the benefits bestowed by plaintiff without compensating him." (*Ibid.*)

These same considerations support our conclusion that ADRI should not be denied relief. The ban on the corporate practice of medicine is meant to protect patients, not health care service plans; a contract for the provision of medical services by licensed professionals is plainly not malum in se; Blue Shield would be unjustly enriched if it were allowed to retain the benefit of services bestowed on its subscribers without compensating ADRI. In Minnesota, where similar equitable concerns are weighed in determining whether to enforce illegal contracts, the high court refused to void a contract in violation of the ban on the corporate practice of medicine. (*Isles Wellness v. Progressive* (Minn. 2006) 725 N.W.2d 90, 92–95.) The court allowed a general corporation to recover payment from its patients' insurers for services provided by licensed chiropractors employed by the corporation. (*Ibid.*) In so doing, the court noted that "[p]ermitting insurance companies to avoid liability under their insurance contracts does little to protect patients from the 'specter of lay control over professional judgment.' " (*Id.* at p. 95.) We agree, and conclude that the circumstances presented here do not warrant voiding ADRI's provider contract with Blue Shield.

### B.  *ADRI is entitled to dispute Blue Shield's coverage determination*

The provider contract requires Blue Shield to pay ADRI for "covered services." Blue Shield's subscriber contracts exclude from coverage services that are "Experimental or Investigational in Nature," defined as "any treatment, therapy, procedure, drug, or drug usage . . . which [is] not recognized in accordance with generally accepted professional medical standards as being safe and effective for use in the treatment of the illness, injury, or condition at issue." Blue Shield denied payment to ADRI on the stated ground that the PIVIT medical treatment ADRI provided was experimental, and thus not covered.

Blue Shield argues that medical providers like ADRI have no right under their provider contracts to contest coverage determinations. According to Blue Shield, only subscribers can contest coverage. Blue Shield is mistaken. Nothing in the law precludes providers from seeking direct compensation from a health care service plan, nor from disputing a health plan's determination of the value of covered services. (*Bell v. Blue Cross of California* (2005) 131 Cal.App.4th 211, 217–218 & fn. 6 [31 Cal.Rptr.3d 688].) We likewise see no reason to preclude providers from disputing a health plan's determination that a treatment is not a covered service.

Blue Shield seems to contend that the terms of the provider contract itself preclude ADRI from disputing coverage because the contract entitled ADRI to payment for "covered services" and Blue Shield decided that PIVIT is not a covered service. The circularity of this argument is apparent, and nothing in the contract suggests that Blue Shield's unilateral determination of coverage is immune from challenge.

We also reject Blue Shield's claim that "allowing ADRI to challenge the scope of covered services would effectively circumvent express limitations built into the subscriber agreements." ADRI's coverage challenge is not, as Blue Shield asserts, a de facto assignment of the subscribers' nonassignable right to contest coverage. ADRI's right to contest coverage arises under its own provider contract with Blue Shield, not the subscribers' distinct contracts with the health plan. For the same reason, the four-year statute of limitations applicable to ADRI's breach of contract suit does not "clash[]" with the shorter limitations period applicable to a subscriber's action to recover benefits under the subscriber contract. The contracts, and rights, of providers and subscribers are distinct. Likewise, Blue Shield's exposure to potential multiple suits regarding the same health care benefit is a product of its multiple contracts, and does not evidence any circumvention of the subscriber agreements.

Nor do we credit Blue Shield's argument that allowing ADRI to contest the health plan's coverage determination would "circumvent the statutory [independent medical review] procedure by allowing providers to sue plans directly in the first instance, rather than requiring subscribers to seek independent medical review of the determination." IMR (independent medical review) is an *optional* grievance procedure available to subscribers who are denied coverage for assertedly experimental therapies. (Health & Saf. Code, §§ 1370.4, 1374.30.) Contrary to Blue Shield's suggestion, IMR is not the exclusive means available to subscribers denied coverage. (Health & Saf. Code, § 1368, subd. (d); Insurance Litigation, *supra*, ¶ 6:995; see *Kotler v. PacifiCare of California* (2005) 126 Cal.App.4th 950, 956 [24 Cal.Rptr.3d 447] [subscriber sued MCO for breach of contract for failure to provide timely treatment].) As Blue Shield's own contract advises its subscribers, IMR "is in addition to any other procedures or remedies available to you and is completely voluntary on your part; you are not obligated to request external review." Allowing ADRI to contest coverage will not circumvent any statutory requirement of IMR because, simply put, there is no such requirement.

### C. *Blue Shield is collaterally estopped from asserting that PIVIT is experimental*

In 2002, an administrative law judge concluded that ADRI's PIVIT treatment is not experimental. The action was an administrative appeal after

MCO's (administered by Blue Shield) denied coverage for PIVIT treatment provided by ADRI. The MCO's are self-funded PPO's (PERS Care and PERS Choice) created by the California Public Employees' Retirement System (CalPERS) for its members. Blue Shield served as third party administrator for approval, processing, and payment of all health care insurance claims for the MCO's. In 1998, Blue Shield decided that PIVIT was experimental and stopped paying for ADRI's treatment. Several MCO subscribers contested Blue Shield's coverage determination through internal, then administrative, proceedings.

An administrative judge, following a two-week testimonial hearing, issued a comprehensive 57-page decision, which stated: "hepatic activation [PIVIT] is now, and has been since at least 1987, in accordance with generally accepted medical professional standards as being safe and effective for use in the treatment of Type 1 and Type 2 diabetes and its complications. There was significant, persuasive, credible proof of this in this record, with respect to respondents [subscribers] and others as well."

■ The trial court here ruled that this prior administrative determination collaterally estopped Blue Shield from asserting that PIVIT is experimental, and thus not covered by the health plan. Blue Shield disputes the court's ruling upon contentions that the issue resolved in the prior administrative hearing is not identical to the issue here and that Blue Shield was not in privity with the MCO's in the prior proceeding. We affirm the ruling.

1. *General principles of collateral estoppel*

■ " 'Collateral estoppel is one aspect of the broader doctrine of res judicata. . . . "Where res judicata operates to prevent relitigation of a cause of action once adjudicated, collateral estoppel operates . . . to obviate the need to relitigate issues already adjudicated in the first action. . . . The purposes of the doctrine are said to be 'to promote judicial economy by minimizing repetitive litigation, to prevent inconsistent judgments which undermine the integrity of the judicial system, [and] to protect against vexatious litigation.' " ' " (*Gottlieb v. Kest* (2006) 141 Cal.App.4th 110, 147–148 [46 Cal.Rptr.3d 7].) The doctrine of collateral estoppel has traditionally "been applied to give conclusive effect in a collateral court action to a final adjudication made by a court in a prior proceeding." (*People v. Sims* (1982) 32 Cal.3d 468, 477 [186 Cal.Rptr. 77, 651 P.2d 321], superseded by statute on another ground as stated in *Gikas v. Zolin* (1993) 6 Cal.4th 841, 851–852 [25 Cal.Rptr.2d 500, 863 P.2d 745].) But the doctrine may also be applied to administrative decisions possessing a judicial character. (*Pacific Lumber Co. v. State Water Resources Control Bd.* (2006) 37 Cal.4th 921, 944 [38 Cal.Rptr.3d 220, 126 P.3d 1040].)

■ The California Supreme Court has recently reiterated the guiding principles of collateral estoppel: " 'Collateral estoppel precludes relitigation of issues argued and decided in prior proceedings.' [Citation.] The doctrine applies 'only if several threshold requirements are fulfilled. First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.' " (*Pacific Lumber Co. v. State Water Resources Control Bd., supra,* 37 Cal.4th at p. 943.)

### 2. *Identical issues*

Blue Shield focuses exclusively upon the first and fifth requirements, and says the trial court erred in finding identity of issues and privity. On identity of issues, the trial court found that the same issue was presented in the administrative proceeding and this lawsuit: is PIVIT experimental? Blue Shield claims this is a "vast oversimplification of the relevant 'issue' " and that "[t]here are two key respects in which the issues are not identical: first, different contracts to be interpreted, and second, different time periods in which to evaluate the information underlying the experimental determination."

The factors Blue Shield cites are immaterial. In both the administrative proceeding and this case, the identical October 1990 provider contract is at issue. Only the underlying subscriber contracts differ from the prior proceeding in this case; both contain the exact same definition of experimental treatments. It is also meritless to argue, as does Blue Shield, that the administrative determination concerned a different time period than the period at issue here. As the trial court rightly found, the denial of coverage for PIVIT announced in 1998 under the CalPERS MCO's "was the same, simultaneous decision that Blue Shield made with respect to its own insured members."

We fail to see how, as Blue Shield asserts, "this action depends on Blue Shield's determination that PIVIT was experimental based on its [February 2001] medical policy formulated and implemented after the 1998 determination." Blue Shield's ad hoc medical policy adverse to PIVIT coverage is largely irrelevant to this action, as it was to the administrative action. The administrative judge found the medical policy inapplicable to the CalPERS subscribers' claims because the decisions denying them coverage were made and affirmed before the policy was enacted. Similarly, ADRI's reimbursement claim here is founded on the 1998 denial of coverage.

Blue Shield seems to suggest that PIVIT may not have been experimental in 1998 but is experimental now under the current state of medical evidence, which includes its February 2001 medical policy that reviewed and analyzed research and reports on PIVIT. But the record does not show that medical evidence on PIVIT changed with the promulgation of Blue Shield's 2001 policy. The administrative decision, while ruling the 2001 policy inapplicable to antecedent denials of coverage, did not omit the policy's findings when reviewing the state of the evidence on PIVIT—it rejected them. "Even though inapplicable to these claims, application of the Blue Shield Medical Policy on Quality and Technology Assessment Review criteria avails Blue Shield-CalPERS little. [PIVIT] meets the criteria and the tests set forth in the Policy. [Fn. omitted.]" The administrative law judge reached this conclusion after an extensive review of scientific literature, studies, and clinical results. Blue Shield has failed to show any lack of identity of issues precluding estoppel.

### 3. *Privity*

Blue Shield was not a party to the prior administrative proceeding in which PIVIT was found not to be experimental. The trial court found that Blue Shield was nevertheless bound by the administrative decision because Blue Shield was in privity with CalPERS, the losing party. The evidence of privity included the fact that Blue Shield was the administrator for the approval, processing, and payment of all health care insurance claims for CalPERS. It was Blue Shield's denial of coverage that was disputed in the administrative proceeding. Blue Shield witnesses testified in the administrative proceeding in defense of Blue Shield's coverage determination, including the health plan's medical director who was responsible for reviewing PIVIT claims. Blue Shield had a single provider contract with ADRI under which ADRI provided services to CalPERS subscribers and Blue Shield's own subscribers. On the record presented, the trial court did not err in finding that Blue Shield was in privity with CalPERS.

"[T]he word 'privy' has acquired an expanded meaning. The courts, in the interest of justice and to prevent expensive litigation, are striving to give effect to judgments by extending 'privies' beyond the classical description. [Citation.] The emphasis is not on a concept of identity of parties, but on the practical situation." (*People ex rel. State of Cal. v. Drinkhouse* (1970) 4 Cal.App.3d 931, 937 [84 Cal.Rptr. 773].) " 'Privity is essentially a shorthand statement that collateral estoppel is to be applied in a given case; there is no universally applicable definition of privity.' [Citation.] The concept refers 'to a relationship between the party to be estopped and the unsuccessful party in the prior litigation which is "sufficiently close" so as to justify application of the doctrine of collateral estoppel.' " (*People v. Sims, supra*, 32 Cal.3d at pp. 486–487.)

▆▆ Notions of privity have been expanded to the limits of due process. (*Clemmer v. Hartford Insurance Co.* (1978) 22 Cal.3d 865, 875 [151 Cal.Rptr. 285, 587 P.2d 1098].) "In the context of collateral estoppel, due process requires that the party to be estopped must have had an identity or community of interest with, and adequate representation by, the losing party in the first action as well as that the circumstances must have been such that the party to be estopped should reasonably have expected to be bound by the prior adjudication." (*Ibid.*)

Blue Shield had an identity or community of interest with CalPERS. As the trial court noted, "Blue Shield was the health plan administrator for CalPERS and as the administrator, Blue Shield stood in for CalPERS and made coverage decisions which were at issue in the prior proceedings. The denial of coverage for [PIVIT] was the same, simultaneous decision that Blue Shield made with respect to its own insured members. Moreover, the interests of Blue Shield in the present action, and CalPERS in the prior action, were the same community of interests. Both parties' interests were to deny coverage and payment for [PIVIT] to members for services provided by ADRI." The administrative law judge also apparently saw a community of interest between Blue Shield and CalPERS; the decision refers to "[t]he allegations made by Blue Shield *and* CalPERS, that [PIVIT] is still experimental . . . ." (Italics added.)

On appeal, Blue Shield argues that it had no community of interest with CalPERS because CalPERS's interest was in avoiding retrospective reimbursement of payments for pre-1999 treatment, not future payments. The record is to the contrary. The administrative decision states that CalPERS was defending denial by its third party administrators (Blue Shield, then Blue Cross) of payments "from July 1998 forward." As here, ADRI continued to provide therapy to patients after Blue Shield's July 1998 coverage denial, pending adjudication of the coverage dispute. CalPERS had a manifest interest in avoiding coverage for claims through the date of the administrative decision in January 2002, and beyond. Contrary to Blue Shield's argument on appeal, CalPERS did not have a lesser stake than Blue Shield in the determination that PIVIT is not experimental. The administrative determination impacted both health care service plans equally.

▆▆ Blue Shield was also adequately represented by CalPERS. Blue Shield denies this conclusion, and argues that it would have utilized better advocacy with more extensive development of the evidence, less reliance on written declarations in lieu of live testimony, and better expert witnesses. The argument reveals a misunderstanding of the adequate representation requirement of collateral estoppel. "The cases do not undertake to measure the adequacy of the representation on the basis of an assessment of the performance of the losing party's counsel." (*Aronow v. LaCroix* (1990) 219

Cal.App.3d 1039, 1049 [268 Cal.Rptr. 866].) Instead, the cases "typically determine the question of adequate representation by inference, examining whether the losing party in the suit which is asserted to have a preclusive effect had the same interest as the party to be precluded, and whether that losing party had a strong motive to assert that interest. If the interests of the parties in question are likely to have been divergent, one does not infer adequate representation and there is no privity." (*Ibid.*) As we noted above, the interests of Blue Shield and CalPERS were not divergent but identical, and CalPERS's motive for asserting that interest was strong.

Blue Shield's argument that it would have litigated its interest in the administrative proceeding "differently, and more vigorously" than CalPERS fails to negate a finding of adequacy of representation. Criticisms of counsel's performance in prior proceedings are disregarded when assessing adequacy of representation for purposes of collateral estoppel. (*Aronow v. LaCroix, supra,* 219 Cal.App.3d at p. 1049.) The criticisms ring hollow anyway, as CalPERS was represented by the California Attorney General, who is commonly considered to zealously and competently litigate cases. (*Citizens for Open Access etc. Tide, Inc. v. Seadrift Assn.* (1998) 60 Cal.App.4th 1053, 1070–1072 [71 Cal.Rptr.2d 77].) Moreover, the administrative proceeding did not present a close case that turned on the vigor of counsel. The administrative law judge stated: "The great weight of the evidence in this matter . . . is that [PIVIT] is not and was not experimental and investigational for respondents at the time it was offered forward . . . . The burden of proof was really not much of a factor, as the evidence in support of these propositions was substantial and persuasive, and the evidence in support of the application of the exclusions and limitations was not."

In its analysis of privity, the trial court also properly found that Blue Shield reasonably should have expected to be bound by the prior adjudication. " 'A nonparty should reasonably be expected to be bound if he had in reality contested the prior action even if he did not make a formal appearance. Thus, collateral estoppel has been applied against nonparties who had a proprietary or financial interest in and control of, a prior action. [Citations.]' [Citation.] The doctrine is also applicable where the nonparty has such an interest 'in the determination of a question of fact or law with reference to the same subject matter or transaction.' " (*Ceresino v. Fire Ins. Exchange* (1989) 215 Cal.App.3d 814, 820 [264 Cal.Rptr. 30].) Blue Shield had a strongly shared interest in the determination of whether PIVIT is experimental, and a financial interest in denying coverage.

Blue Shield argues that it did not have control over the prior action, and "[t]he party against whom collateral estoppel is sought must have had the ability to control the prior action." Blue Shield is mistaken. While control

over the prior action is commonly present in applications of collateral estoppel, it is not essential: "preclusion can apply even in the absence of such control." (*Aronow v. LaCroix, supra,* 219 Cal.App.3d at p. 1050.) The question is whether, under the circumstances as a whole, "the party to be estopped should reasonably have expected to be bound by the prior adjudication." (*Clemmer v. Hartford Insurance Co., supra,* 22 Cal.3d at p. 875.) Blue Shield, as CalPERS's third party administrator and the one that made the contested coverage determination, should reasonably have expected to be bound by the administrative decision.

Finally, we discern no public policy reason against applying collateral estoppel here. The doctrine of collateral estoppel aims " ' " 'to promote judicial economy by minimizing repetitive litigation, to prevent inconsistent judgments which undermine the integrity of the judicial system, [and] to protect against vexatious litigation.' " ' " (*Gottlieb v. Kest, supra,* 141 Cal.App.4th at p. 148.) The trial court weighed these interests against the interests of Blue Shield and found that "[t]he balance of these interests tip[s] highly in favor of applying collateral estoppel to bar Blue Shield from relitigating whether [PIVIT] is experimental." The trial court noted, for example, that application of collateral estoppel "prevents the possibility of a dramatically inconsistent judgment—i.e., one disallowing payment to providers for the same treatment that was ordered paid in the proceedings below." In other words, refusing to apply collateral estoppel risked a judgment disallowing PIVIT payments to ADRI for Blue Shield health plans despite a prior administrative decision mandating PIVIT payments to ADRI for CalPERS health plans administered by Blue Shield.

Blue Shield argues that a possible difference in the resolution of subscribers' claims for PIVIT coverage would not be an inconsistent judgment but "an inevitable byproduct of different coverage terms in different subscriber contracts." Not so. The subscriber contracts in the CalPERS administrative proceeding and this action contain the exact same definition of experimental treatments. Application of collateral estoppel here will thus prevent inconsistent judgments and promote judicial economy by minimizing repetitive litigation. As to the remaining public policy interest, Blue Shield is correct in pointing out that collateral estoppel does nothing here to protect against vexatious litigation. Neither Blue Shield nor ADRI was party to the prior proceeding. We also appreciate Blue Shield's desire to litigate the issue of whether PIVIT is experimental in a forum that permits it control over the presentation of evidence and the advocacy of its position. Nevertheless, we agree with the trial court that a balancing of interests favors application of collateral estoppel.

## V. DISPOSITION

The judgment is affirmed.

Reardon, Acting P. J., and Rivera, J., concurred.

A petition for a rehearing was denied July 15, 2008, and appellant's petition for review by the Supreme Court was denied September 17, 2008, S165500.