Filed 11/20/20  Sehremelis v. Sehremelis CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JOHN SEHREMELIS et al., | |
| Plaintiffs and Respondents, | G057541 |
| v. | (Super. Ct. No. 30-2016-00875465) |
| ANDREA SEHREMELIS, as Trustee, etc. | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, David L. Belz, Judge.  Affirmed in part, reversed in part.

Klapach & Klapach, and Joseph S. Klapach for Defendants and Appellants.

Bunt & Shaver, and David N. Shaver for Plaintiff and Respondent.

\*          \*          \*

In 2014, George A. Sehremelis established a revocable trust for the benefit of his four children: Andrea, Froso, John and Peter.  Article IV, section (B)(8) of the trust

provided that "upon the approval of a majority of the grantor's then living children, the trust may be terminated at an earlier date, and the property comprising the trust estate distributed in equal shares to the income beneficiaries of the trust estate." George died in July 2016, and two months later, three of his children petitioned the superior court to terminate the trust pursuant to article IV, section (B)(8). The trustees -- Andrea and Joseph Ressler -- argued the language of article IV, section (B)(8) is precatory, not mandatory, and thus the trustees could exercise their discretion to not terminate the trust despite the approval of a majority of George's children to terminate the trust.

Following a bench trial, the trial court determined the language of article IV, section (b)(8) was unambiguous, and the early termination provision vests the discretionary power to terminate the trust in the children, not the trustees. The court ordered the trust terminated, and to ensure an orderly dissolution process, it removed the trustees and appointed Wells Fargo Bank as the new independent trustee. The trustees appealed, arguing the trial court misinterpreted the early termination provision and abused its discretion in removing them as trustees.

As discussed below, we conclude the language in the early termination provision is unambiguous and mandatory. The trial court properly ordered the trust terminated. We also conclude the trial court did not abuse its discretion in removing Andrea as a trustee because the hostility and lack of trust between Andrea and his siblings would impair the administration of the trust. The trial court, however, erred in removing Ressler because there was no evidence of similar hostility or lack of trust. Because the removal of Ressler as trustee was erroneous, the appointment of Wells Fargo Bank was unnecessary and contrary to George's intent. Accordingly, we affirm the judgment in part and reverse in part.

I

FACTUAL AND PROCEDURAL BACKGROUND

2

A. *Trust Documents*

On September 23, 2014, George created the revocable trust, naming himself as the trustee, his sons Andrea and John as the family cotrustees, and Joseph T. Ressler as the independent cotrustee. His daughter Froso, his son Peter and Wells Fargo Bank were named as successor trustees.

The trust documents enumerated the powers of a trustee, but noted the enumerated powers were "in addition to those powers now or hereafter conferred by law or other provisions of this instrument." The enumerated trustee powers included the power to sell, exchange or repair trust property, but did not include the power to terminate the trust. The trust documents also included a spendthrift provision, which limits the transfer of a beneficiary interest in trust assets.

Article IV of the trust documents detailed George's wishes about the distribution of the trust when he died. Article IV, section (B)(1) provides: "It is the desire of the grantor that the investments of the grantor in real estate be maintained in a form similar to that owned at the time of the grantor's death, and held, administered and distributed by the trustees for the long term benefit of his children and their own children (grandchildren of the grantor). To accomplish this, the grantor intends that the properties be retained provided, however, that upon agreement of a majority of the then living children of the grantor, specific properties may be sold. In addition, the trustees shall have discretion where appropriate, by their decision, to exchange properties for other replacement properties. The proceeds from sale of property should be held, administered, and distributed in the same manner as the properties initially distributed under this instrument. The trustee shall also have discretion as to the property operation or sale of the businesses conducted by LLCs, corporations or other entities owned by the trust, though it is anticipated that so long as they are reasonably profitable, these businesses may continue to be operated in such manner as the trustees determine."

3

Article IV, section (B)(8) provides: "Notwithstanding the foregoing provisions, upon the approval of a majority of the grantor's then living children, the trust may be terminated at an earlier date, and the property comprising the trust estate distributed in equal shares to the income beneficiaries of the trust estate. Such division may be made by physical segregation of assets or by assignment or transfer of undivided interests in all or any part of the property comprising the trust estate."

Article V provides that "[u]nless terminated at an earlier date in accordance with other provisions of this instrument, the trust . . . shall terminate on the date which is twenty-one (21) years after the death of the last survivor of the beneficiaries of such trusts who are living at the time of the death of the grantor."

On September 9, 2015, George amended his trust to remove John as a family cotrustee and Wells Fargo Bank as a successor trustee. A month before his death, on June 2, 2016, George amended the trust to add to the list of trustee powers the power to employ and delegate authority to agents.

B. *Instant Action*

George died on July 4, 2016. Following George's death, John and Peter filed a petition to terminate the trust pursuant to Article IV, section (B)(8).[1]

Andrea and Ressler objected to the petition to terminate the trust. They noted that in a prior proceeding, the San Bernardino Superior Court ruled that the language in Article IV, section (B)(1) is "precatory language and not mandatory." They argued that "[l]ike the language of Trust Article IV, Section (B)(1) . . . , Article IV, Section (B)(8), on which Petitioners base their request for instruction to wind up the

---

[1]     The petition also alleged causes of action for the return of property (baseball card collection) to the trust and for breach of fiduciary duty. The trial court, however, found George had gifted the collection to Andrea's son, and it did not find a breach of fiduciary duty. Respondents do not challenge those determinations on appeal.

Trust, contains the same precatory language and does not give the Petitioners the absolute right to terminate the Trust."

C. *Trial Testimony*

Ressler, the independent trustee, testified George wanted to control his estate "from the grave, to where it continues to benefit his children and grandchildren. And then 21 years after his last grandchild passed away, it was his wish[ ] that it would be able to be dissolved then." George never spoke with Ressler about the early termination provision. About 10 months before George died, George amended his trust to remove John as a trustee because John had stopped speaking with George and letting him see his grandchildren. Ressler also testified he does the accounting for the trust, but he did not prepare the accounting filed with the court.

John Sehremelis testified that after his father had a medical emergency in 2016, George spoke with John about redoing his trust. A week later, while George and John were talking with Ressler about the family business accounts, Ressler recommended George consult the law firm of Rodi Pollock for his estate planning. John drove his father to the law firm, where they met William Christian.

During the meeting with Christian, George stated he wanted John and Andreas as cotrustees with Ressler as the mediator because he knew John and Andrea "didn't get along." George wanted the trust to exist after he died. However, George also wanted an "escape hatch" to allow the majority to "dissolve the trust and go their own ways" because of the discord among his children. George never discussed leaving money to his grandchildren.

Several weeks later, George and John received copies of the trust documents and discussed various trust provisions, including the early termination provision. According to John, George told him the early termination provision was "in case you guys don't get along, because of what is going on, and it seems to be getting worse." George made clear he intended the early termination provision to allow a

5

majority of his children to "just change and sell all of his assets." John also testified George complained to him about Andrea's financial irresponsibility on multiple occasions.

In August 2016, John signed a document, along with his siblings Peter and Froso, to dissolve the trust. Peter testified he signed the document to terminate the trust because he did not trust or have faith in Andrea. Froso also testified she wanted to dissolve the trust because she did not trust Andrea.

Over respondents' objections, the trial court permitted attorney Marshal Oldman to testify as an expert on a trustee's standard of care in exercising discretion under the trust document. Oldman opined a trustee would not abuse his discretion to decline to terminate the trust despite the vote of the majority of the current beneficiaries, if the trustee engaged in a weighing process of the relevant factors. Oldman also opined the trustee owed a duty to George's grandchildren.

Oldman admitted he never met or spoke with George. He acknowledged his opinion differed from the opinion of Elizabeth Blakely of the Rodi Pollock law firm, who was the attorney for the trustees following Christian's death in 2016. Oldman also conceded the word "notwithstanding" in Article IV, section (B)(8) meant the early termination provision would control even if other provisions were contrary.

Attorney Brandon Roesler testified he represented George in obtaining a restraining order against Froso in early 2016. A few weeks after Roesler started representing George, Andrea retained him to file a lawsuit against one of Andrea's siblings.

Rosa Castanon testified George hired her to work at one of his restaurants in 1990. She became the restaurant's manager in 2000, and currently works for Andrea. Castanon testified that in 2014 or 2015 she overheard George complaining to Andrea about John taking money from the restaurant's registers. George often told Castanon he was tired of supporting his kids and their family. In 2014, George handed Castanon his

will to place in the restaurant's safe, and told her that Andrea was going to take care of everything, that Andrea was his only responsible child, and that Andrea was going to make sure everything was done according to George's will.

Randall Hausauer, a close friend of George, testified he spoke with George about George's estate plan. George said he wanted "his grandchildren to be well taken care of." George praised Andrea's ability to handle money while expressing concern about "his other three children being able to manage money."

Andrea Sehremelis testified that in 2014 George expressed concerns to him about his siblings' handling of money. In August and September of 2014, George spoke with Andrea about George's trust. George told Andrea: "He wanted his assets to grow. He wanted a legacy for his grandkids and great grandkids to have . . . [¶] . . . he wanted [Andrea] to protect his grandchildren, to make sure they were educated . . . [and] had health insurance all their lives . . . And . . . cash flow enough that it would generate a good income for his kids to live off of." According to Andrea, George intended the early termination provision to allow the trustees the discretionary power to terminate the trust upon a majority vote of the beneficiaries.

On cross-examination, Andrea acknowledged that in response to a special interrogatory asking why the trustees have not terminated the trust, on May 4, 2017, he responded: "Administration of the trust, the estate tax return, and liquidation of trust assets are occurring so the trust can be terminated." Andrea conceded he received $991,800 in fees for his trustee work from the date George died, July 4, 2016 to June 30, 2017. Ressler received $42,788 in trustee fees for the same period. **~(5RT 871.)~**

D. *Trial Court's Ruling and Posttrial Proceedings*

Following the bench trial, the trial court issued a tentative statement of decision. In the statement of decision, the trial court found the language in article IV, section (B)(8) was "unambiguous." "[A]lthough it was the wish of the settlor, George Sehremelis, that the real estate assets of his estate be maintained in a form similar to that

7

owned at the time of his death for the benefit of his children and grandchildren (Article IV section B paragraph 1), the plain language of the trust [in article IV, section (b)(8)] is to be understood to allow for a termination of the trust by majority vote of the then living surviving children of the Settlor George Sehremelis."

After noting that extrinsic evidence of George's intent could be used to reform an unambiguous trust provision, the trial court concluded the trustees failed to meet their burden of proof to show by clear and convincing evidence that George intended to vest the trustees with the power to terminate the trust at an earlier date. In reaching its conclusion, the court stated that Andrea's receipt of almost $1 million in trustee fees weighed against the credibility of his testimony because Andrea had a financial incentive not to terminate the trust. The court also found George was aware of the history of conflict within the family, and it noted the "considerable conflict and family dysfunction [was] observed by the Court and [was] reflected in the [trial] testimony. These family members have filed lawsuits against one another and currently have pending lawsuits."

The trial court also exercised its discretionary authority under the Probate Code to suspend the current trustees and to appoint Wells Fargo Bank as the interim trustee. Following objections from the trustees, the court reserved the issue of removing the trustees and set the matter for "an Order to Show Cause re Why the Court Should Not Exercise Authority under Probate Code Section 17206 to Suspend and/or Remove the Trustees and Appoint Wells Fargo as an Independent Trustee for the purpose of liquidating and making distribution of the Trust assets."

Following the hearing on the Order to Show Cause, the trial court exercised its authority under Probate Code sections 17206 and 15642 to remove Andrea and Ressler as trustees. It appointed Wells Fargo Bank as trustee for the asset liquidation and distribution of Trust assets, "as per the wishes of the settlor George A. Sehremelis that Wells Fargo be considered as a successor trustee." The court found it would be in the

8

best interest of the trust to remove Andrea and Ressler as trustees for the "various reasons stated in the proposed statement of decision." It also found "no need for Ressler to continue as Trustee" due to the appointment of Wells Fargo as an independent trustee.

II

DISCUSSION

A. *Early Termination Provision*

The trustees argue the trial court misinterpreted article IV, section (B)(8). "'The interpretation of a written instrument, including a . . . declaration of trust, presents a question of law unless interpretation turns on the competence or credibility of extrinsic evidence or a conflict therein. Accordingly, a reviewing court is not bound by the lower court's interpretation but must independently construe the instrument at issue. [Citations.]' [Citations.]" (*Scharlin v. Superior Court* (1992) 9 Cal.App.4th 162, 168.) "In construing a trust instrument, the intent of the trustor prevails and it must be ascertained from the whole of the trust instrument, not just separate parts of it. [Citation.]" (*Ibid.*) In interpreting a document such as a trust, it is proper for the trial court in the first instance and the appellate court on de novo review to consider the circumstances under which the document was made so that the court may be placed in the position of the testator or trustor whose language it is interpreting, in order to determine whether the terms of the document are clear and definite, or ambiguous in some respect. (*Estate of Russell* (1968) 69 Cal.2d 200, 208-210.) Thus, extrinsic evidence as to the circumstances under which a written instrument was made is admissible to interpret the instrument, although not to give it a meaning to which it is not reasonably susceptible. (*Id.* at p. 211.) Particularly in the field of interpreting trusts and wills, each case depends upon its own peculiar facts, and "'precedents have comparatively small value. . . .'" (*Estate of Lawrence* (1941) 17 Cal.2d 1, 6.)

Here, article IV, section (B)(8) provides in relevant part: "Notwithstanding the foregoing provisions, upon the approval of a majority of the grantor's then living

9

children, the trust may be terminated at an earlier date, and the property comprising the trust estate distributed in equal shares to the income beneficiaries of the trust estate." After independently reviewing the trust provisions, we conclude this language is unambiguous. By its plain language, article IV, section (B)(8) vests the discretionary power to terminate the trust at an earlier date in the children, not the trustees. Thus, the trustees must terminate the trust if a majority of the children agree to terminate the trust.

The extrinsic evidence of the circumstances under which the trust was created support our interpretation. It is undisputed there was a history of conflict between Andrea and his siblings. The appointment of Ressler as an independent trustee who could act as a tiebreaker in the case of a conflict between Andrea and John as trustees demonstrates George was aware of the conflict among his children and provided the means to resolve their conflict in the trust. The early termination provision was another method to resolve intrafamily conflict because it permitted the siblings to permanently resolve any disputes over the administration of the trust.[2]

The trustees raise several arguments to support their claim the early termination provision permits but does not mandate the trustees terminate the trust "upon the approval of a majority of the grantor's then living children." The trustees note that "approval" generally means "'confirming, ratifying, assenting, sanctioning or consenting to some act or thing done by another,'" and argues the term "approval" in article IV, section (B)(8) must therefore refer to the approval of the trustees' decision to terminate the trust, and not their own decision to terminate the trust. However, even under the trustees' definition of "approval," one of the grantor's children may approve the decision

---

[2]     Although we have concluded the language of article IV, section (B)(8) is unambiguous, to the extent it is ambiguous, John's testimony about the early termination provision resolves any ambiguity in favor of our interpretation that article IV, section (B)(8) vests the power to terminate the trust at an earlier date in the children, not the trustees. As noted, John testified George intended the early termination provision to allow the majority of his children to "sell all of his assets."

10

of another child or the decision of a group of the grantor's children. Here, three of the children approved the proposal to terminate the trust.

The trustees also argue the use of the permissive term "may" in article IV, section (B)(8), rather than the term "shall," demonstrates the grantor's intent that termination would be at the discretion of the trustees, not immediately upon approval of the children. We disagree because the term "may" in article IV, section (B)(8), merely vests the discretionary power to terminate the trust with the person or persons chosen by the grantor. Specifically, the discretionary authority to terminate the trust at an earlier date was vested in the majority of George's children. Thus, the children may or may not decide to terminate the trust.

The trustees also argue similar language in article IV, section (B)(1), support their interpretation the trustees have the discretionary power to terminate the trust. As noted above, article IV, section (B)(1), provides that "upon agreement of a majority of the then living children of the grantor, specific properties may be sold." The trustees note the San Bernardino Superior Court has interpreted this language to mean the trustees, not the majority of the grantor's children, have the discretionary power to sell specific property. We are not persuaded the San Bernardino Superior Court's interpretation of article IV, section (B)(1), compels a similar interpretation of article IV, section (B)(8). First, the San Bernardino Superior Court's judgment is not binding because it interpreted a different provision of the trust document. (See *Lucido v.*

11

*Superior Court* (1990) 51 Cal.3d 335, 341 ["Collateral estoppel precludes relitigation of issues argued and decided in prior proceedings."].)[3]

Second, article IV, section (B)(8), expressly authorizes early termination "[n]otwithstanding the foregoing provisions." Thus, article IV, section (B)(8) is an exception to the other provisions in the trust documents, including article IV, section (B)(1).

Finally, article IV, section (B)(1) contains language differentiating its grant of discretionary power to sell specific property from the grant of discretionary power to terminate the trust in article IV, section (B)(8). In article IV, section (B)(1), after providing that specific properties may be sold upon agreement of the majority of the children, the next sentence provides: "*In addition*, the trustees shall have discretion where appropriate, by their decision, to exchange properties for other replacement properties." (Italics added.) The transitional term "In addition" informs the reader that the power granted in the prior sentence is similar and complementary to the power granted in the current sentence. Because the current sentence vests the discretionary power to exchange properties in the trustees, the power to sell specific properties in the

---

[3] The trustees' reliance on *California Physicians' Service v. Aoki Diabetes Research Institute* (2008) 163 Cal.App.4th 1506 (*California Physicians' Service*), and *McMillin Development, Inc. v. Home Buyers Warranty* (1998) 68 Cal.App.4th 896 (*McMillin Development*), is misplaced. In *California Physicians' Service*, *supra*, the appellate court concluded a prior administrative determination was binding because "in both the administrative proceeding and this case, the identical October 1990 provider contract is at issue." (*California Physicians' Service*, *supra*, 163 Cal.App.4th at p. 1520.) Here, a different provision is at issue. In *McMillin Development*, *supra*, the appellate court declined to address the trial court's determination that a federal district court's order compelling arbitration based on similar arbitration language in a different contract between the same parties was binding because "[i]n light of the trial court's waiver determination and our agreement with that determination, any discussion of the res judicata issue would be unnecessary dicta." (*McMillin Development*, *supra*, 68 Cal.App.4th at p. 906, fn. 5.) The case therefore does not provide support for the trial court's res judicata ruling. Moreover, the instant case is distinguishable because, as discussed below, the language in the two provisions is not similar.

12

prior sentence must also be vested in the trustees. No similar language, however, is found in article IV, section (B)(8). Indeed, the lack of similar language in article IV, section (B)(8), supports our interpretation the discretionary power to terminate the trust at an earlier date is *not* vested in the trustees. (See Civ. Code § 1641 ["The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."].) In sum, the trial court properly granted the petition to terminate the trust.

B. *Removal of Trustees*

As noted, the trial court removed Andrea and Ressler as trustees. Removal of a trustee is governed by Probate Code section 15642, which includes several specific grounds for removal, including breach of trust, hostility among cotrustees, and excessive compensation (*id.*, subds. (b)(1), (3), (5)), and the catchall, "[f]or other good cause." (*Id.,* subd. (b)(9).) In light of the catchall, Probate Code section 15642 effectively continues the preexisting rule placing the decision to remove a trustee in the sound discretion of the trial court. (*Estate of Gilmaker* (1962) 57 Cal.2d 627, 633; *Estate of Bixby* (1961) 55 Cal.2d 819, 826.) Nonetheless, "this is a power that the court should not lightly exercise." (*Estate of Bixby*, at p. 826.)

We review the trial court's decision to remove a trustee for an abuse of discretion. (*Copley v. Copley* (1981) 126 Cal.App.3d 248, 286 (*Copley*).) "'An abuse of discretion occurs only if the reviewing court, considering the applicable law and all of the relevant circumstances, concludes that the trial court's decision exceeds the bounds of reason and results in a miscarriage of justice.' [Citations.] In applying the abuse of discretion standard, 'we resolve all evidentiary conflicts in favor of the judgment and determine whether the court's decision "'falls within the permissible range of options set by the legal criteria.'" [Citation.] We may reverse only if the trial court's decision "'exceeds the bounds of reason, all of the circumstances before it being considered.'"" (*Orange Catholic Foundation v. Arvizu* (2018) 28 Cal.App.5th 283, 292-293.)

13

The trustees argue there was no good cause to remove Andrea as a trustee, noting the trial court did not find any breach of trust or excessive compensation. The trustees acknowledge the trial court found "considerable conflict and family dysfunction," but argues George was aware of these facts when he appointed Andrea as a trustee. They cite the well-established principle that a "'court will not ordinarily remove a trustee named by the settlor upon a ground existing at the time of his appointment and known to the settlor and in spite of which the settlor appointed him, although the court would not have appointed him trustee.'" (*In re Brown's Estate* (1937) 22 Cal.App.2d 480, 486, quoting Restatement of the Law on Trusts, section 107.)

However, "[h]ostility between the beneficiary and the trustee is a ground for removal of the trustee when the hostility impairs the proper administration of the trust." (*Estate of Gilmaker* (1962) 57 Cal.2d 627, 632; accord, *Copley*, *supra*, 126 Cal.App.3d at p. 288 ["Hostility, antagonism and inevitable future conflict can justify an order of removal of the trustee when those factors impair the proper administration of the trust"].) Here, the conflict between the siblings had developed to the point where the other siblings did not trust Andrea and filed the instant lawsuit alleging various claims against him. The siblings also were involved in the San Bernardino action. The trial court personally observed the family dysfunction, and its appointment of a neutral trustee rather than one of the other siblings named as a successor trustee indicates the court believed only a neutral trustee would result in the proper administration of the trust. In light of the present hostility between Andrea and his siblings and the likelihood of further litigation over the administration of the trust, the trial court did not abuse its discretion in removing Andrea as a trustee.

Although the trial court did not abuse its discretion in removing Andrea as a trustee, the factual record does not support removal of Ressler for good cause. There was no testimony that John, Froso and Peter did not trust or were hostile to Ressler. Although Ressler has not performed many trustee duties, as evidenced by the fees he

14

earned, nothing suggests Ressler is incompetent or would be unable to perform the duties of a trustee in the absence of Andrea. The trial court abused its discretion in removing Ressler.

Having reached the conclusion the trial court improperly removed Ressler, the trial court's appointment of Wells Fargo as the new independent trustee was not necessary. We also note that in their appellate brief respondents have asserted that Wells Fargo has declined the appointment.

## III

### DISPOSITION

The judgment granting the petition to terminate the trust and removing Andrea as a trustee is affirmed. The removal of Ressler as a trustee is reversed. The parties are to bear their own costs on appeal.

ARONSON, ACTING P. J.

WE CONCUR:

FYBEL, J.

GOETHALS, J.

15