[No. G042207. Fourth Dist., Div. Three. May 3, 2010.]

ALEX WALD, Plaintiff and Appellant, v.
TRUSPEED MOTORCARS, LLC, Defendant and Respondent.

COUNSEL

Law Office of John D. Ott and John D. Ott for Plaintiff and Appellant.

Law Office of Rick Augustini and Rick Augustini for Defendant and Respondent.

OPINION

SILLS, P. J.—

## I. INTRODUCTION

Back in the 1940's, a character in a theatrical comedy flatly stated that there is no such thing as a perfect crime. To which the retort was: "Ever buy a used car?"[1]

The exchange might be a bit out of date today. California law has not only required car dealers to be licensed since 1959 (see Veh. Code, § 11700,[2] added by Stats. 1959, ch. 3, § 2, p. 1523), but has subjected car dealers to specific statutes against fraud (see generally § 11711) since that date as well. And a relatively recent statute, section 11711.3 (added by Stats. 2002, ch. 407, § 2) goes so far as to completely preclude *any* recovery by a dealer of the price of a car if the dealer is not licensed. The "dominant purpose" of California's statutory car dealer licensing scheme is, of course, the protection of car *buyers* from irresponsible or unscrupulous dealers. (*Valiyee v. Department of Motor Vehicles* (1999) 74 Cal.App.4th 1026, 1032 [88 Cal.Rptr.2d 508].)

The irony of the present case is that a scheme designed to protect consumers from unscrupulous dealers has, at least under the law as interpreted by the trial court on a successful demurrer, resulted in a *car dealer* reaping the benefit of an outright fraud on one of its salespeople, to whom it owed substantial finder's fees. The theory, which the trial court accepted on demurrer, was that the salesman really was *himself* a used car dealer, and, because *he* did not have a dealer's license, he could not complain when he was not paid his finder's fees for about 11 cars he obtained for the dealership.

---

[1] The play was Our Gal Sal: A Delightful Comedy in Three Acts by Peggy Fernway, copyright 1947, 1975 by Samuel French, Inc., act II. A character named Dagmar delivers the straight line. Sal delivers the punch line.

[2] All further undesignated statutory references in this opinion are to the Vehicle Code.

At this stage we deal only with the facts in the complaint. That said, to affirm would be to allow the car dealership to get away with a perfect crime. We reverse.

## II. THE COMPLAINT AND DEMURRER

The last operative complaint by plaintiff was the second amended complaint. Again, we stress that the case comes to us after a sustained demurrer without leave to amend. That means plaintiff Alex Wald is entitled to all reasonable inferences from facts alleged in that document, but not conclusions of law.

The story alleged is this: Plaintiff Wald is in "the business" of finding, buying and then selling again used Porsches.[3] Defendant TruSpeed Motorcars, LLC, is in the "business of selling used Porsches." TruSpeed liked Wald's ability to find used Porsches, and in June 2008 Wald and three representatives of TruSpeed met to work out an arrangement.[4] The meeting resulted in an oral agreement which would work this way: Wald would locate a used Porsche, and "propose" the car to TruSpeed. If TruSpeed was "interested," Wald and TruSpeed would negotiate a price between themselves. Then Wald would return to the owner and negotiate a lower price: The difference between the Wald-TruSpeed price and the Wald-owner price would be Wald's compensation—though there was a statement by one of the TruSpeed representatives that Wald would receive no less than $500 per vehicle.[5]

---

[3] The relevant language from the second amended complaint is: Plaintiff "has been and remains in the business of locating, purchasing and selling high performance automobiles, including Porsches. Plaintiff had demonstrated an ability and expertise to locate Porsche automobiles and negotiate a reasonable purchase price."

[4] The relevant language from the second amended complaint is: Plaintiff and the TruSpeed representatives "met at the offices of Truspeed for the purpose of working out a business arrangement. [¶] Before that meeting Scott McCloud [one of the representatives] called Plaintiff and said that Rob Morgan [another TruSpeed representative] wanted Plaintiff to come down to Truspeed and discuss an employment arrangement. McCloud offered Plaintiff at least $1,500 per car to locate them for Truspeed, an amount that Plaintiff declined as being too low. Also prior to the meeting, Plaintiff was told by Truspeed representatives that Truspeed did not have the time to find vehicles, arrange shipping, arrange pre-purchase inspections and other related tasks. Truspeed actively sought the services of Plaintiff because they knew he could find the cars they wanted and did not want other car dealers in the same business to get the benefit of Plaintiff's services."

[5] The relevant language from the second amended complaint is: "Plaintiff and Truspeed entered into an oral agreement whereby Plaintiff would locate Porsche automobiles and propose the vehicle to Truspeed. If Truspeed was interested, Plaintiff and Truspeed would negotiate a price for the vehicle. Once that price was agreed upon, Plaintiff would then negotiate with the owner of the vehicle to purchase it. Plaintiff would receive the difference between the amount Plaintiff and Truspeed agreed on as a price and the amount that Plaintiff

Importantly, the actual buying of a used Porsche would be done by TruSpeed: It would be TruSpeed that would write the check and do the other paperwork to actually procure the car from the owner located by Wald and at the price negotiated by him.[6] Thus—if we may make a reasonable inference from that allegation—Wald would not automatically get paid as might be the case if he bought the used Porsche himself and then resold it to the dealer. He was dependent on the dealer for any compensation for his services. The parties thus called the compensation a "finder's fee" and Wald trusted TruSpeed to obtain any necessary licenses to implement the arrangement.[7]

A few other aspects of the complaint are noteworthy: The TruSpeed representatives asked Wald whether he would be interested in selling vehicles for TruSpeed "on the floor," though the parties agreed that "Plaintiff would essentially be locating cars from private parties and would receive a finder's fee" for his work. A TruSpeed representative also asked Wald to "assist with pre-purchase inspections and shipping," and also "encouraged [Wald] to spend time at the store, offered [him] an office and asked [him] to help on the sales floor once or twice a week."

The complaint does not say that Wald accepted any of these "on the floor" offers. But the complaint does say that TruSpeed's representative Rob Morgan and Wald had a discussion over the possibility that some of the prospective buyers might not want to sell to a dealer (which was the substance of the arrangement—TruSpeed would be the real buyer). In this conversation, Morgan told Wald he "did not care how" Wald "got the cars and encouraged [Wald] to lie to the sellers and say whatever it took to get the cars." The complaint does not say whether Wald actually misrepresented his

---

negotiated with the owner of the vehicle. Thus, if TruSpeed agreed on a price of $40,000 for a vehicle and Plaintiff ultimately negotiated a price of $35,000 with the owner, Plaintiff would receive $5,000 as compensation. As part of the agreement, Plaintiff was obligated to exclusivity with Truspeed whereby Plaintiff was required to provide Truspeed with the right of first refusal on each Porsche that he located. Rob Morgan stated that under the agreement, Plaintiff would make $500 on some cars and could make more than $5,000 on other cars depending on the deal and that, in any event, Plaintiff would not make less than $500 on any car."

[6] The relevant language from the second amended complaint is: "On vehicles that were located, Truspeed would purchase the vehicles directly from the private sellers, handle all of the paperwork, and write the checks."

[7] The relevant language from the second amended complaint is: "During the discussions, Plaintiff was asked whether he would be interested in selling vehicles for Truspeed on the floor, and that he should have a salesperson's license. The parties agreed that Plaintiff would essentially be locating cars from private parties and would receive a finder's fee, the amount of which was determined as set forth hereinabove. Based on the statements of Truspeed's representatives, Plaintiff understood that Truspeed, who had superior knowledge of the business of selling vehicles and the necessary licensing requirements and obligations, would get any necessary licenses for Plaintiff to accomplish the purposes of the arrangement. Plaintiff was also told that he would be an independent contractor and would receive a 1099 for whatever he was paid. Further, Plaintiff would not be involved in purchasing or selling cars."

ultimate purpose of having TruSpeed buy the used Porsches, but the allegations to the effect that it was TruSpeed which wrote the checks and actually did all the buying establishes a reasonable inference that Wald did not lie and that all sellers knew that the buyer of their cars was a dealer.

About 11 cars were obtained by Wald for TruSpeed under the arrangement, and if the contract had been honored Wald would have been paid about $40,000. TruSpeed, however, reneged on the deal and refused to pay Wald his fees for any of the cars obtained.[8] TruSpeed's profits on the cars were alleged to exceed $100,000.

TruSpeed filed a demurrer based on Wald's lack of a dealer's license (and lack of a salesperson's license for that matter). The trial court sustained, without leave to amend, TruSpeed's demurrer to four of the five causes of action set forth in the second amended complaint,[9] overruling a cause of action for common counts for $524.66 in actual expenses incurred. The court ruled that section 11711.3, which applies to unlicensed *dealers*, precluded any recovery by Wald of monies owed under the oral contract. As against Wald's argument that he was really a salesperson and his claims could be enforced in equity despite his lack of a salesperson's license, the trial court alluded to *Tri-Q, Inc. v. Sta-Hi Corp.* (1965) 63 Cal.2d 199 [45 Cal.Rptr. 878, 404 P.2d 486], a case dealing generally with when "illegal" contracts may be enforced, but found the case inapplicable.[10] We will have more to say about *Tri-Q* and its ensuing jurisprudence in a moment.

After Wald himself dismissed his surviving fifth cause of action with prejudice, a judgment was entered against him. From that judgment he has timely appealed.

---

[8] The relevant language from the second amended complaint is: "From and after the date of the agreement, Plaintiff located and offered to Truspeed numerous vehicles. Plaintiff and Truspeed agreed on and completed transactions on at least 11 vehicles which were subject to this agreement. In addition, Plaintiff incurred expenses on some of the vehicles for which Truspeed agreed to reimburse and lost income as a result of the right of first refusal obligation. Plaintiff's right to compensation under the agreement with respect to the completed transaction, reimbursement rights, and lost income exceeds $40,000."

[9] The four causes of action were: breach of contract, account stated, unjust enrichment, and fraud.

[10] To quote from the substantive portion of the minute order: "In connection with defendant's demurrer which was argued at the hearing on 3/11/09, the Court has again reviewed the papers filed by plaintiff and defendant. The Court has also read Tri-Q v. Sta-Hi Corp.[, *supra*,] 63 Cal 2d 199 cited by plaintiff in his opposition to the demurrer. The facts of Tri-Q which is an Unfair Competition case are clearly very distinguishable from the fact situation of the instant case and Tri-Q is not persuasive with respect to the issues raised by the demurrer. It is clear from the Complaint that Plaintiff much more fits the definition of 'dealer' as defined by Vehicle Code Section 285 than the definition of a 'salesperson' as defined by VC Section 675. In addition to not being licensed as a dealer, Plaintiff admits that he was also not licensed as a salesman pursuant to V. C. Section 11800."

## III. DISCUSSION

### A. *In Substance, a Salesperson*

■ Section 11711.3 is strict. Very strict. Basically it says: If you are a car dealer and you sell a car, if you are not licensed, you can be stiffed by the buyer, and there's nothing you can do about it.[11]

The operative words in section 11711.3 are in its opening clause, introducing the subject of a long sentence: "A person acting as a dealer, who was not *licensed as a dealer as required by this article* . . . ." (Italics added.) The reader is immediately referred to the licensing requirements of "this article," which is in section 11700 et seq.[12] As noted in the introduction, those statutes have provided since 1959 that car dealers must be licensed.

There is a statutory definition of "dealer" in the Vehicle Code, to be found in section 285. We reproduce the entirety of the statute in the margin.[13]

Readers should notice this about the statute: It was obviously intended to be read in conjunction with a list of exceptions spelled out in section 286, because, if read independent of the exceptions in section 286, section 285 pretty much covers *anybody* whoever buys or sells a car, including ordinary consumers simply hoping to get a few bucks on their old clunker as a

---

[11] The complete text of section 11711.3 is as follows: "A person acting as a dealer, who was not licensed as a dealer as required by this article, or a person acting as a lessor-retailer, who was not licensed as a lessor-retailer as required by Chapter 3.5 (commencing with Section 11600), may not enforce any security interest or bring or maintain any action in law or equity to recover any money or property or obtain other relief from the purchaser or lessee of a vehicle in connection with a transaction in which the person was, at the time of the transaction, required to be licensed as a dealer or a lessor-retailer."

[12] In pertinent part, section 11700 provides: "No person shall act as a dealer . . . without having first been issued a license as required in Section 11701 or temporary permit issued by the department, except that, when the license or temporary permit has been canceled, suspended, or revoked or has expired, any vehicle in the dealer's inventory and owned by the dealer when the dealer ceased to be licensed may be sold at wholesale to a licensed dealer."

[13] " 'Dealer' is a person not *otherwise expressly excluded by Section 286* who:

"(a) For commission, money, or other thing of value, sells, exchanges, buys, or offers for sale, negotiates or attempts to negotiate, a sale or exchange of an interest in, a vehicle subject to registration, a motorcycle, snowmobile, or all-terrain vehicle subject to identification under this code, or a trailer subject to identification pursuant to Section 5014.1, or induces or attempts to induce any person to buy or exchange *an interest in a vehicle and, who receives or* expects to receive a commission, money, brokerage fees, profit, or any other thing of value, from either the seller or purchaser of the vehicle.

"(b) Is engaged wholly or in part in the business of selling vehicles or buying or taking in trade, vehicles for the purpose of resale, selling, or offering for sale, or consigned to be sold, or otherwise dealing in vehicles, whether or not the vehicles are owned by the person." (§ 285, italics added.)

trade-in. Basically the scheme is: Define everybody who sells or buys or even negotiates in regard to buying or selling a car as a "dealer," then provide a list of exclusions from the otherwise blanket coverage of the statute.

So now to section 286, which lists "who is not a dealer" even though they otherwise would fall under the rubric of "dealer" in the previous statute. We also reproduce the entirety of that statute in the margin.[14] One of the reasons we provide the entire statute is so that readers can see the exertions of the Legislature in trying to work around a statutory scheme which first so broadly defines a category as to be virtually unrealistic (e.g., anyone who ever tries to sell his or her own car is a "dealer" under the definition) and then tries to remove from that broad definition people and organizations that are obviously not dealers. Thus section 286 goes to some lengths to define and then exempt charitable organizations to which consumers can donate cars, as well as ordinary consumers themselves and auto clubs that will often helpfully negotiate firm prices from certain dealers (real dealers), thus sparing their

[14] "The term 'dealer' does not include any of the following:

"(a) Insurance companies, banks, finance companies, public officials, or any other person coming into possession of vehicles in the regular course of business, who sells vehicles under a contractual right or obligation, in performance of an official duty, or in authority of any court of law, if the sale is for the purpose of saving the seller from loss or pursuant to the authority of a court.

"(b) Persons who sell or distribute vehicles of a type subject to registration or trailers subject to identification pursuant to Section 5014.1 for a manufacturer to vehicle dealers licensed under this code, or who are employed by manufacturers or distributors to promote the sale of vehicles dealt in by those manufacturers or distributors. However, any of those persons who also sell vehicles at retail are vehicle dealers and are subject to this code.

"(c) Persons regularly employed as salespersons by vehicle dealers licensed under this code while acting within the scope of that employment.

"(d) Persons engaged exclusively in the bona fide business of exporting vehicles or of soliciting orders for the sale and delivery of vehicles outside the territorial limits of the United States, if no federal excise tax is legally payable or refundable on any of the transactions. Persons not engaged exclusively in the bona fide business of exporting vehicles, but who are engaged in the business of soliciting orders for the sale and delivery of vehicles, outside the territorial limits of the United States are exempt from licensure as dealers only if their sales of vehicles produce less than 10 percent of their total gross revenue from all business transacted.

"(e) Persons not engaged in the purchase or sale of vehicles as a business, who dispose of any vehicle acquired and used in good faith, for their own personal use, or for use in their business, and not for the purpose of avoiding the provisions of this code.

"(f) Persons who are engaged in the purchase, sale, or exchange of vehicles, other than motorcycles, all-terrain vehicles, or trailers subject to identification under this code, that are not intended for use on the highways.

"(g) Persons temporarily retained as auctioneers solely for the purpose of disposing of vehicle stock inventories by means of public auction on behalf of the owners at the owners' place of business, or as otherwise approved by the department, if intermediate physical possession or control of, or an ownership interest in, the inventory is not conveyed to the persons so retained.

"(h) Persons who are engaged exclusively in the business of purchasing, selling, servicing, or exchanging racing vehicles, parts for racing vehicles, and trailers designed and intended by

members the burden of haggling. Even *yacht brokers* have to be specifically exempted from section 285's ambit.

the manufacturer to be used exclusively for carrying racing vehicles. For purposes of this subdivision, "racing vehicle" means a motor vehicle of a type used exclusively in a contest of speed or in a competitive trial of speed which is not intended for use on the highways.

"(i) A person who is a lessor.

"(j) A person who is a renter.

"(k) A salvage pool.

"(*l*) A yacht broker who is subject to the Yacht and Ship Brokers Act (Article 2 (commencing with Section 700) of Chapter 5 of Division 3 of the Harbors and Navigation Code) and who sells used boat trailers in conjunction with the sale of a vessel.

"(m) A licensed automobile dismantler who sells vehicles that have been reported for dismantling as provided in Section 11520.

"(n) The Director of Corrections when selling vehicles pursuant to Section 2813.5 of the Penal Code.

"(o)(1) Any public or private nonprofit charitable, religious, or educational institution or organization that sells vehicles if all of the following conditions are met:

"(A) The institution or organization qualifies for state tax-exempt status under Section 23701d of the Revenue and Taxation Code, and tax-exempt status under Section 501(c)(3) of the federal Internal Revenue Code.

"(B) The vehicles sold were donated to the nonprofit charitable, religious, or educational institution or organization.

"(C) The vehicles subject to retail sale meet all of the applicable equipment requirements of Division 12 (commencing with Section 24000) and are in compliance with emission control requirements as evidenced by the issuance of a certificate pursuant to subdivision (b) of Section 44015 of the Health and Safety Code. Under no circumstances may any institution or organization transfer the responsibility of obtaining a smog inspection certificate to the buyer of the vehicle.

"(D) The proceeds of the sale of the vehicles are retained by that institution or organization for its charitable, religious, or educational purposes.

"(2) An institution or organization described in paragraph (1) may sell vehicles on behalf of another institution or organization under the following conditions:

"(A) The nonselling institution or organization meets the requirements of paragraph (1).

"(B) The selling and nonselling institutions or organizations enter into a signed, written agreement pursuant to subparagraph (A) of paragraph (3) of subdivision (a) of Section 1660.

"(C) The selling institution or organization transfers the proceeds from the sale of each vehicle to the nonselling institution or organization within 45 days of the sale. All net proceeds transferred to the nonselling institution or organization shall clearly be identifiable to the sale of a specific vehicle. The selling institution or organization may retain a percentage of the proceeds from the sale of a particular vehicle. However, any retained proceeds shall be used by the selling institution or organization for its charitable, religious, or educational purposes.

"(D) At the time of transferring the proceeds, the selling institution or organization shall provide to the nonselling institution or organization, an itemized listing of the vehicles sold and the amount for which each vehicle was sold.

"(E) In the event the selling institution or organization cannot complete a retail sale of a particular vehicle, or if the vehicle cannot be transferred as a wholesale transaction to a dealer licensed under this code, the vehicle shall be returned to the nonselling institution or organization and the written agreement revised to reflect that return. Under no circumstances may a selling institution or organization transfer or donate the vehicle to a third party that is excluded from the definition of a dealer under this section.

"(3) An institution or organization described in this subdivision shall retain all records required to be retained pursuant to Section 1660.

And, of course, car dealer salespeople are also exempted, in section 286, subdivision (c). That exemption is remarkably fairly short: "(c) Persons regularly employed as salespersons by vehicle dealers licensed under this code while acting within the scope of that employment." (*Ibid.*)

 Vehicle salespeople, as distinct from dealers, are defined in section 675. We set out the entire statute in the margin.[15] It is a kind of miniversion

---

"(p) A motor club, as defined in Section 12142 of the Insurance Code, that does not arrange or negotiate individual motor vehicle purchase transactions on behalf of its members but refers members to a new motor vehicle dealer for the purchase of a new motor vehicle and does not receive a fee from the dealer contingent upon the sale of the vehicle." (§ 286.)

[15] "(a) 'Vehicle salesperson' is a person not otherwise expressly excluded by this section, who does one or a combination of the following:

"(1) Is employed as a salesperson by a dealer, as defined in Section 285, or who, under any form of contract, agreement, or arrangement with a dealer, for commission, money, profit, or other thing of value, sells, exchanges, buys, or offers for sale, negotiates, or attempts to negotiate, a sale, or exchange of an interest in a vehicle required to be registered under this code.

"(2) Induces or attempts to induce any person to buy or exchange an interest in a vehicle required to be registered, and who receives or expects to receive a commission, money, brokerage fees, profit, or any other thing of value, from either the seller or purchaser of the vehicle.

"(3) Exercises managerial control over the business of a licensed vehicle dealer or who supervises vehicle salespersons employed by a licensed dealer, whether compensated by salary or commission, including, but not limited to, any person who is employed by the dealer as a general manager, assistant general manager, or sales manager, or any employee of a licensed vehicle dealer who negotiates with or induces a customer to enter into a security agreement or purchase agreement or purchase order for the sale of a vehicle on behalf of the licensed vehicle dealer.

"(b) The term 'vehicle salesperson' does not include any of the following:

"(1) Representatives of insurance companies, finance companies, or public officials, who in the regular course of business, are required to dispose of or sell vehicles under a contractual right or obligation of the employer, or in the performance of an official duty, or under the authority of any court of law, if the sale is for the purpose of saving the seller from any loss or pursuant to the authority of a court of competent jurisdiction.

"(2) Persons who are licensed as a manufacturer, remanufacturer, transporter, distributor, or representative.

"(3) Persons exclusively employed in a bona fide business of exporting vehicles, or of soliciting orders for the sale and delivery of vehicles outside the territorial limits of the United States.

"(4) Persons not engaged in the purchase or sale of vehicles as a business, disposing of vehicles acquired for their own use, or for use in their business when the vehicles have been so acquired and used in good faith, and not for the purpose of avoiding the provisions of this code.

"(5) Persons regularly employed as salespersons by persons who are engaged in a business involving the purchase, sale, or exchange of boat trailers.

"(6) Persons regularly employed as salespersons by persons who are engaged in a business activity which does not involve the purchase, sale, or exchange of vehicles, except incidentally

of section 285's definition of dealer. First, in section 675, subdivision (a), the statute sets forth a series of categories, any one of which is sufficient to make a person a salesperson, and then, in subdivision (b), it lists exceptions. Among the categories bringing a person within the definition are formal employment "as a salesperson by a dealer, as defined in Section 285," but also a person who "under *any form of contract*, agreement, or arrangement *with a dealer*, for commission, money, profit, or other thing of value, sells, exchanges, buys, or offers for sale, *negotiates*, or attempts to negotiate, a sale, or exchange of an interest in a vehicle required to be registered under this code." (§ 675, subd. (a)(1), italics added.)

None of the exceptions in section 675, subdivision (b) applies here. We need only note that one of those exceptions ("Persons regularly employed as salespersons by a vehicle dealer authorized to do business in California under Section 11700.1 of the Vehicle Code") refers to out-of-state dealers, as distinct from TruSpeed.[16]

The law prefers *substance* to form, and in substance, Wald was regularly employed as TruSpeed's salesperson. The essence of Wald's services were in *negotiating* with used Porsche owners for their vehicles—the same sort of work that car salespeople do every day when a buyer comes in with a trade-in, and work that fits within section 675's inclusion of people who professionally negotiate for dealers as salespeople. On top of that, it is a reasonable inference that Wald was devoting a substantial portion of his time to work *on behalf of* dealer TruSpeed, i.e., he was "regularly employed" as a salesperson. Moreover, Wald received all compensation for his services directly from TruSpeed, with all paperwork on the cars purchased handled by TruSpeed.

in connection with the purchase, sale, or exchange of vehicles of a type not subject to registration under this code, boat trailers, or midget autos or racers advertised as being built exclusively for use by children.

"(7) Persons licensed as a vehicle dealer under this code doing business as a sole ownership or member of a partnership or a stockholder and director of a corporation or a member and manager of a limited liability company licensed as a vehicle dealer under this code. However, those persons shall engage in the activities of a salesperson, as defined in this section, exclusively on behalf of the sole ownership or partnership or corporation or limited liability company in which they own an interest or stock, and those persons owning stock shall be directors of the corporation; otherwise, they are vehicle salespersons and subject to Article 2 (commencing with Section 11800) of Chapter 4 of Division 5.

"(8) Persons regularly employed as salespersons by a vehicle dealer authorized to do business in California under Section 11700.1 of the Vehicle Code." (§ 675.)

[16] Section 11700.1 provides: "A dealer who does not have an established place of business in this state but who is currently authorized to do business as, and who has an established place of business as, a vehicle dealer in another state is not subject to licensure under this article if the business transacted in California is limited to the importation of vehicles for sale to, or the export of vehicles purchased from, persons licensed in California under this chapter."

## B. *Compensation Enforceable in Equity*

■ Determining that Wald is a salesperson, as distinct from a dealer, is not, however, the end of the matter. Under section 11800, salespeople too must be licensed.[17] And there is no question that Wald did not have a salesperson's license.

*But*—the statutory sanctions for unlicensed work are different for dealers and salespeople, perhaps reflecting a recognition on the part of the Legislature that the law should not be used to oppress unlicensed car salespeople from being paid for their work. Thus, while section 11711.3 is borderline draconian in its bar of unlicensed dealers from getting paid—no right in law, no right in equity, no how, no way—there is no similar statute precluding, a priori, any possibility that salespeople will get paid for their unlicensed work. The reasonable inference in the scheme is that the Legislature was willing to leave the payment of unlicensed salespeople up to the courts under existing case law involving illegal contracts.

Which brings us back to *Tri-Q, Inc. v. Sta-Hi Corp., supra*, 63 Cal.2d 199 (*Tri-Q*), a case the trial court did not think applicable because it was an unfair competition case. We must part company with the trial court on the case.

To be sure, *Tri-Q* was a dispute between two manufacturers in which one accused the other of undercutting its competitors to gain a monopoly in the newspaper machinery market. But the *Tri-Q* court did have some *general* things to say about how courts should treat efforts to recover under illegal agreements, in considering a second action by one of the manufacturers against a former officer involving the backdating of some stock purchases to perpetrate a tax fraud, and a claim by the officer for the balance of agreed consideration despite the "improper" tax purposes of agreement. (See *Tri-Q, supra*, 63 Cal.2d at pp. 217–218.)

■ The Supreme Court *allowed*, in *Tri-Q*, the officer "the aid of the courts in obtaining the agreed consideration for the assets which he [had] delivered" to the manufacturer. (*Tri-Q, supra*, 63 Cal.2d at p. 220.) In the passage in the opinion allowing his claim, the high court pointed to four factors that allowed the officer to sue despite the illegality of the agreement: (1) the greater moral fault of the manufacturer; (2) the lack of "serious moral turpitude" in the conduct of the officer; (3) the fact the manufacturer would

---

[17] Section 11800 provides in full: "It shall be unlawful for any person to act as a vehicle salesperson without having first procured a license or temporary permit issued by the department or when that license or temporary permit issued by the department has been canceled, suspended, revoked, or invalidated or has expired."

be unjustly enriched if the contract were not enforced; and (4) the deterrent policy of the law would be "best realized" by allowing the officer's claim rather than letting the manufacturer keep the benefit of its illegal bargain.[18]

And indeed, *Tri-Q* has engendered a line of jurisprudence (e.g., *Asdourian v. Araj* (1985) 38 Cal.3d 276 [211 Cal.Rptr. 703, 696 P.2d 95] (*Asdourian*); *California Physicians' Service v. Aoki Diabetes Research Institute* (2008) 163 Cal.App.4th 1506 [78 Cal.Rptr.3d 646] (*California Physicians' Service*)) which, in contexts other than backdated stock option purchase agreements, have distilled the same or similar factors. (*Asdourian, supra*, 38 Cal.3d at p. 292 [" ' "In each case, the extent of enforceability and the kind of remedy granted depend upon a variety of factors, including the policy of the transgressed law, the kind of illegality and the particular facts." ' "]; *California Physicians' Service, supra*, 163 Cal.App.4th at p. 1516.)

As a gloss on what the Supreme Court said in *Asdourian*, the *California Physicians' Service* court stressed (1) sophistication of the defendant (and hence whether a member of the class needed protection); (2) whether the illegality was malum in se or malum prohibitum; and (3) whether *not* enforcing the agreement might result in the unjust enrichment of the defendant. (See *California Physicians' Service, supra*, 163 Cal.App.4th at pp. 1516–1517 ["In *Asdourian* . . . our Supreme Court enforced oral home improvement contracts, despite a regulatory statute requiring such contracts to be in writing. . . . In enforcing the contracts, the court noted that the defendant property owners were not unsophisticated consumers but real estate investors, and thus 'are not members of the group primarily in need of the statute's protection.' . . . Also, the contracts at issue were not malum in se ('immoral in character, inherently inequitable or designed to further a crime or obstruct justice') but were malum prohibitum ('only voidable depending on the factual context and the public policies involved'). . . . The court also noted that the contracts had been fully performed, and that the defendants would be unjustly enriched if 'allowed to retain the value of the benefits bestowed by plaintiff without compensating him.' " (Citations omitted.)].)

---

[18] Here is that passage. The court had just surveyed a number of cases involving enforcement of illegal contracts: "If these rules be applied to the facts of this case no reason appears why Satre [(the officer)] should be denied the aid of the courts in obtaining the agreed consideration for the assets which he has delivered to Sta-Hi [(the manufacturer)]. Except for payment of that consideration, 'the transaction has been completed,' and the public requires no further protection. Sta-Hi is clearly guilty of the greater moral fault, and Satre's conduct involved little, if any, serious moral turpitude. Certainly, refusal of the courts to enforce the agreement would 'permit defendant [Sta-Hi] to be unjustly enriched at the expense of plaintiff.' Such a course would result in a forfeiture 'disproportionately harsh considering the nature of the illegality,' and the respective conduct of the parties. Finally, 'effective deterrence . . . [will be] best realized by enforcing plaintiff's [Satre's] claim rather than by leaving the defendant [Sta-Hi] in possession of the benefit.' " (*Tri-Q, supra*, 63 Cal.2d at p. 220, fns. omitted.)

Indeed, *California Physicians' Service* is factually quite similar to the case at hand: Both cases involve a debtor trying to repudiate a debt based on the putatively illegal *business status* of the creditor. There, a health care provider, a diabetes research institute, sued a health care service plan for breach of contract, seeking reimbursement for medical services provided to the plan's members. But the plan said that the provider was "illegally organized as a nonprofit corporation instead of a professional medical corporation or partnership." (*California Physicians' Service, supra*, 163 Cal.App.4th at p. 1510.) Applying the factors noted above, the appellate court easily affirmed a judgment for the provider. (See *id.* at p. 1517 ["These same considerations support our conclusion that ADRI should not be denied relief. The ban on the corporate practice of medicine is meant to protect patients, not health care service plans; a contract for the provision of medical services by licensed professionals is plainly not malum in se; Blue Shield would be unjustly enriched if it were allowed to retain the benefit of services bestowed on its subscribers without compensating ADRI."].)

■ Applying *Tri-Q, Asdourian, California Physicians' Service* yields an ineluctable result:

(1) The class [of people who are the beneficiaries of California's car dealership licensing scheme and preclusions against recovery by unlicensed dealers] is most certainly not the car dealers themselves.

﹒(2) The greater moral fault is easily TruSpeed's. It knew of the licensing statutes, it seeks to enjoy a tangible windfall based on Wald's work and deny him all recompense for it. All it posits in opposition to the moral fault point (in respondent's brief) are arguments to the effect that Wald should have known to get a license and wasn't in compliance with the licensing statutes. Indeed, nothing in the facts indicates "moral turpitude" on Wald's part. (Again, the inference at this stage is that he did not follow TruSpeed's direction to lie about TruSpeed being the ultimate buyer of the used Porsches.) All he did was find cars for TruSpeed and negotiate an acceptable price for *TruSpeed* to buy the cars and then resell. Nothing in *Wald* being able to receive compensation for his efforts is "malum in se."

(3) TruSpeed will be unjustly enriched by the value of Wald's services ($40,000 worth). All TruSpeed has to offer against the point (in respondent's brief) is an argument that misconstrues the complaint: TruSpeed says that Wald's "real complaint is that [TruSpeed] should have paid the sellers more and given him the difference." No—Wald's "real complaint" is that he *found* cars for TruSpeed at prices that TruSpeed would pay, but TruSpeed now wants to diddle him out of his "finder's fee."

(4) The deterrent policy of the law regulating *dealerships* would be "best realized" by allowing Wald's claim to proceed. Nothing in this salesperson-dealer dispute implicates the real reason for the dealer licensing statutes and section 11711.3 in particular, which is to protect *the public* from unscrupulous dealers. (See *Merrill v. Department of Motor Vehicles* (1969) 71 Cal.2d 907, 918 [80 Cal.Rptr. 89, 458 P.2d 33] ["Looking to the entire statutory scheme governing the licensing of automobile dealers . . . we observe that the primary concern therein manifested is that the public be protected from unscrupulous and irresponsible persons in the sale of vehicles subject to registration under the code." (Citation omitted.)].) It would upend that statutory goal to allow a dealer to use the licensing statute to get away with not paying for services actually rendered. (Cf. *Tri-Q, supra,* 63 Cal.2d at p. 218 [allowing recovery under illegal contracts so as to "to prevent the guilty party from reaping the benefit of his wrongful conduct"].)

## C. *The Fraud Claim*

TruSpeed says that, even if Wald can state contract or unjust enrichment claims against it, his fraud claim still must be subject to dismissal for his failure to plead it with sufficient particularity.

The basis of Wald's fraud claim (the fourth cause of action in the complaint) is, as one might expect, the allegation that TruSpeed made its promise to pay Wald not having any intention to perform. Hence, "After just two months and after substantial services were provided and knowingly received by Truspeed, Truspeed informed [Wald] that it was not going to pay him because it did not believe that any court would uphold an oral agreement."

 The basic rules as to the need to plead fraud with specificity were recently recapitulated by the court in *Citizens of Humanity, LLC v. Costco Wholesale Corp.* (2009) 171 Cal.App.4th 1, 20 [89 Cal.Rptr.3d 455]: " 'In California, fraud must be pled specifically; general and conclusory allegations do not suffice.' . . . This requirement serves two purposes. First, it gives the defendant notice of the definite charges to be met. Second, the allegations 'should be sufficiently specific that the court can weed out nonmeritorious actions on the basis of the pleadings. Thus the pleading should be sufficient " 'to enable the court to determine whether, on the facts pleaded, there is any foundation, prima facie at least, for the charge of fraud.' " ' . . . Thus, *a plaintiff must plead facts which show how, when, where, to whom, and by what means the representations were made.* . . . When the defendant is a corporate defendant, the plaintiff must further allege *the names of the persons who made the representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written.* . . . There are

certain exceptions to the particularity requirement. 'Less specificity is required when "it appears from the nature of the allegations that the defendant must necessarily possess full information concerning the facts of the controversy." ' " (Italics added; citations omitted.)

Tested under these rules, the complaint passes muster. How: Oral statements made at a meeting. When: June 2008. Where: TruSpeed's offices. To whom: Wald. By what means: Oral statements in which TruSpeed agreed to pay Wald finder's fees. Names of persons speaking for the corporation: Rob Morgan, Scott McCloud and Brack Roederer. Their authority to speak: Rob Morgan had apparent authority to ask Wald to work the floor. To whom they spoke: Wald. What they said: We will pay you a finder's fee for used Porsches we buy based on the prices you negotiate. When it was said: June 2008.

We need only add the following: The allegations that TruSpeed had expertise in licensing, plus the allegation that TruSpeed allowed Wald to work for two months, then repudiated the entire agreement even to the point of not paying Wald's out-of-pocket expenses, would, if proved, allow a reasonable jury to conclude that TruSpeed did have a secret intention to make a promise without any intention of performing it. (See Civ. Code, § 1710, subd. 4 [a "promise, made without any intention of performing it" is a species of "deceit"].) That is, these facts would show that TruSpeed made the agreement with the secret intention of allowing Wald to work without ever being paid because it thought that Wald's lack of a dealer's license would, in effect, be a king's-X, allowing the firm to barefacedly repudiate the oral argument then say to Wald, in effect: "hey neener neener, gotcha sucker." (See *Griffin Dewatering Corp. v. Northern Ins. Co. of New York* (2009) 176 Cal.App.4th 172, 210 [97 Cal.Rptr.3d 568] ["As the trial judge rightly intuited, an insurance company cannot first promise coverage, then barefaced repudiate that promise by pointing to an integration clause in the written contract, and saying in effect, hey 'neener neener.' Indeed, it was the Houston Oral Promise that has posed the biggest problem in the case for us: Surely, we first thought, at least some punitive damages were merited given such a barefaced repudiation."].)

## IV. DISPOSITION

In light of the foregoing—Wald *wins* at this stage—TruSpeed's assertion that this court should dismiss the appeal as frivolous is obviously ill-taken. While the request for dismissal itself borders on the frivolous, we will merely deny the motion to dismiss and leave matters at that. (See *In re Marriage of Koester* (1999) 73 Cal.App.4th 1032, 1041 [87 Cal.Rptr.2d 76] ["Let us merely say that we heartily disapprove of knee-jerk requests for sanctions brought by any litigant, and leave it at that."].)

The judgment is reversed. Appellant Wald shall recover his costs on appeal.

Moore, J., and Aronson, J., concurred.

A petition for a rehearing was denied June 2, 2010, and respondent's petition for review by the Supreme Court was denied July 21, 2010, S183549.